Argued April 6; reversed July 7, 1943

SHAVER FORWARDING CO. *v.* EAGLE STAR
INSURANCE CO., Limited

SHAVER FORWARDING CO. *v.* UNIVERSAL
INSURANCE CO.

(139 P. (2d) 769)

Before Belt, Acting Chief Justice, and Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*MacCormac Snow,* of Portland, for appellants.

*Gunther F. Krause,* of Portland (George J. Perkins, of Portland, on the brief), for respondent.

LUSK, J. These cases were consolidated for trial. They are actions on two identical policies of marine insurance, issued by the defendants-appellants The Eagle Star Insurance Co., Ltd., and Universal Insurance Company, respectively, and covering the stern wheel river steamer, "The Dalles," owned by the plaintiff-respondent Shaver Forwarding Company. The vessel was damaged while it was being hauled out of the waters of the Columbia river upon the marine railway of Ericksen & Klepp at Rainier, Oregon, for the purpose of

inspection and repair. The plaintiff attributed the damage to perils of the river, to-wit: waves caused by passing vessels while "The Dalles" was partly upon the marine railway and partly in the water, and to latent defects in the hog chains of the vessel. A jury found in accordance with the plaintiff's contentions, and the defendants have appealed.

The defendants assign as error the ruling of the court below denying their motions for a directed verdict.

The policies contain the following provision:

"Touching the Adventures and Perils which we, the said Assurers, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortune that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof."

It is conceded that "perils of the seas" is to be read as "perils of the river".

It was further provided:

"This insurance also specially to cover (subject to the free of average warranty) loss of or damage to hull or machinery directly caused by the following:  *  *  *  Bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding, however, the cost and expense of repairing or renewing the defective part) Negligence of Master, Mariners, Engineers or Pilots, provided such loss or damage has not resulted from want of due diligence by the Owners of the Vessel, or any of them, or by the managers."

It was further agreed that the insurance covered the vessel "In port and at sea, in docks and graving docks, and on ways, gridirons and pontoons, at all times, and on all occasions, services, and trades whatsoever and wheresoever, * * *".

The grounds of the motions for a directed verdict (which are the only grounds for consideration here) are:

(1) That the proximate cause of the damage to the vessel was the negligence of Ericksen & Klepp in taking the vessel out of the water;

(2) That waves caused by a passing vessel are not perils of the river;

(3) That the defects in the hog chains were caused by the plaintiff itself or some one acting for it;

(4) That the proof of loss showed that the damage was caused by insufficient blocking when "The Dalles" was being hauled out of the water.

Because of the kind of record made in the court below it is difficult, and at times impossible, to determine the import of much of the evidence introduced on behalf of the plaintiff. The plaintiff's principal witness was Eric Klepp, who had charge of the work of hauling the vessel out of the water. In describing the operation he referred frequently to a diagram drawn on a blackboard, which is not in evidence. Even though the diagram were here it would be of little value to us, because the witness repeatedly indicated points on it without marking them. One answer alone is punctuated with the word "indicating" in parentheses nine times. What the witness indicated we have no way of ascertaining, and, so far as this court is concerned, he might almost as well have been speaking. Greek. If counsel, in a case which is likely

to be brought to this court, are content to let the testimony come in in that fashion, they have only themselves to blame if the members of this court are unable to apprehend the facts. *Harrington v. Portland Traction Co.*, 168 Or. 548, 551, 124 P. (2d) 715; *Gentner v. Kern*, 164 Or. 645, 661, 103 P. (2d) 721; *Maneff v. Lamer*, 152 Or. 619, 624, 54 P. (2d) 287; *Hanks v. Norby*, 152 Or. 610, 613, 54 P. (2d) 836. We will do the best we can under the circumstances to state the facts.

The vessel, "The Dalles", is a stern wheel steamer 190 feet in length over all—160 feet plus the stern wheel. It is of shallow draft and light construction and quite flexible, and is equipped with hog chains to keep the ends from drooping or sagging while in the water. The hog chains are made of heavy bars of iron linked together. They are fastened to the keelson at the bow and stern, and extend through the construction of the deck and pass over hog posts which are floored upon the keelson timbers and rise above the housing of the vessel. They are an essential part of the equipment of this type of vessel.

On August 3, 1938, the vessel was taken to Rainier. The work of hauling it out of the water was done by Ericksen & Klepp, who were independent contractors, with Klepp actively in charge. To bring a vessel onto the ways a cradle or car is used, which runs on steel rails which extend into the river more than 200 feet from the water line. The rails drop in an incline of one foot to twelve feet of their length and are, of course, submerged. The cradle is lowered down the track, the vessel floated onto the end of it, and then hauled out. In this operation the bow of the vessel first rests on the cradle and is made fast while the stern floats in the water. It was while "The Dalles" was in this position that the casualty occurred. Three

hog chains broke; two others apparently pulled out of their fastenings. The vessel's stern was thus without their needed support and sagged, the steam pipes broke, timbers and planking cracked, and other damage was sustained.

■ There is evidence that at the time of this occurrence waves from a passing vessel struck the stern of "The Dalles" and caused her to rise and fall on the water. We agree with counsel for the defendants (who did not appear in the case below) that this evidence is not very satisfactory, but we cannot say that it is not substantial; for, while Klepp testified on direct-examination, in answer to a somewhat suggestive question, that he did not recall whether there was any steamer passing at the time, though he imagined there was, on cross-examination he swore that the allegation in the complaint that "certain large vessels passing up and down the Columbia river opposite the aforesaid marine railways caused large swells to pass under said vessel" was true; and later in his testimony referred to a swell that "caused her to droop * * * and she dropped right there and she pounds and that snaps the hog chains." One of the definitions of the verb "to pound" is "to rise and fall heavily as a ship in rough weather": Funk and Wagnall's Standard Dictionary. Under this testimony, and notwithstanding positive evidence to the contrary coming from a witness for the defendants, the question whether waves from a passing vessel struck the stern of "The Dalles" was for the jury.

There is also evidence that three of the hog chains were improperly welded. This, indeed, is admitted. The broken pieces are in evidence and reveal that the breaks occurred at the points of bad welding. Testimony on behalf of the plaintiff is to the effect

that this condition was not discoverable by ordinarily careful inspection, and, since the hog chains are concededly a part of the hull, a jury question was made as to whether there were latent defects in the hull.

We are brought, then, to the consideration of the questions, first, whether waves in the river set up by a passing vessel are perils of the river within the meaning of the policy, and, second, whether, as the defendant contends, uncontradicted evidence demonstrates that neither perils of the river nor latent defects in the hog chains, but negligence of the independent contractors, was the cause of the damage.

It is first to be observed that there was nothing of an unusual nature about the waves—if there were any—and counsel for the plaintiff concedes in his brief that they were not of an "extraordinary or catastrophic character". It is Klepp's testimony moreover, referring to waves from passing vessels, that "we have that to contend with all the time".

The Supreme Court of the United States in *Hazard's Administrator v. New England Marine Insurance Co.*, 38 U. S. 557, 8 L. Ed. 1043, considered the question whether the loss of a vessel destroyed by worms was a loss caused by perils of the sea. An instruction submitting that question to the jury was held not to be erroneous, the court saying:

> "The court, in their instruction, did not lay down the rule broadly that a destruction by worms was not within the policy: but the jury were told that if, 'in the Pacific Ocean, worms ordinarily assail and enter the bottoms of vessels, then the loss of a vessel destroyed by worms would not be a loss within the policy.' In other words, if the vessel was lost by an ordinary occurrence in the Pacific Ocean, it was a loss against which the underwriters

did not insure. In an enlarged sense, all losses which occur from maritime adventures may be said to arise from the perils of the sea; but the underwriters are not bound to this extent. They insure against losses from extraordinary occurrences only; such as stress of weather, winds and waves, lightning, tempests, rocks, etc. These are understood to be the 'perils of the sea' referred to in the policy, and not those ordinary perils which every vessel must encounter.''

Judge Story's definition in The Reeside, 2 Sumn. 567, Fed. Cas. No. 11,657, is substantially to the same effect. It is quoted in *Compania de Navegacion v. Firemen's Fund. Ins. Co.,* 277 U. S. 66, 72 L. Ed. 787, 792, 48 S. Ct. 459, but the court there held that it is intended to apply to the ordinary case of a seagoing vessel and not to that of a casualty at sea suffered by a tug built for inland waters and undertaking in tow a sea voyage, known to the underwriters, and in contemplation of the parties at the time the insurance was written.

The policies here sued upon are by their terms subject to and governed by English law and usage as to liability for and settlement of claims. A leading English case is *The Xantho,* 12 A. C. 503 (1887). It was held in the House of Lords that foundering caused by collision with another vessel, which occurred without negligence of the carrying ship, is within the exception ''dangers and accidents of the sea'' in a bill of lading. Referring to the term ''perils of the sea'' in marine policies, Lord Herschell said:

''I think it clear that the term 'perils of the sea' does not cover every accident or casualty which may happen to the subject-matter of the insurance on the sea. It must be a peril 'of' the sea. Again, it is well settled that it is not every loss or damage of which the sea is the immediate cause that is

covered by these words. They do not protect, for example, against that natural and inevitable action of the winds and waves, which result in what may be described as wear and tear. There must be some casualty, something which could not be foreseen as one of the necessary incidents of the adventure. The purpose of the policy is to secure an indemnity against accidents which may happen, not against events which must happen. It was contended that those losses only were losses by perils of the sea, which were occasioned by extraordinary violence of the winds or waves. I think this is too narrow a construction of the words, and it is certainly not supported by the authorities, or by common understanding. It is beyond question, that if a vessel strikes upon a sunken rock in fair weather and sinks, this is a loss by perils of the sea. And a loss by foundering, owing to a vessel coming into collision with another vessel, even when the collision results from the negligence of that other vessel, falls within the same category.''

Lord Herschell further said that there was no difference between the term ''perils of the sea'' in a marine policy and in a bill of lading, although the rule of causation is different, inasmuch as in an action on a marine policy only the proximate or immediate cause is considered, so that ''if that which immediately caused the loss was a peril of the sea, it matters not how it was induced, even if it were by the negligence of those navigating the vessel''; while, when liability is sought to be predicated upon a bill of lading ''if a loss through perils of the sea is caused by the previous default of the shipowner, he is liable for this breach of his covenant'': citing *Grill v. General Iron Screw Collier Company,* Law Rep. 1 C. P. 600, 611.

Again it was held in the House of Lords in *Hamilton, Fraser & Co. v. Pandorf,* 12 A. C. 518 (1887), that

damage to a cargo of rice caused by sea water, which came into a vessel through a hole made by the gnawing of rats, was a loss due to "dangers and accidents of the seas" within the meaning of that exception in a bill of lading. Lord Chancellor Halsbury said:

"One of the dangers which both parties to the contract would have in their mind would, I think, be the possibility of the water from the sea getting into the vessel upon which the vessel was to sail in accomplishing her voyage, it would not necessarily be by a storm, the parties have not so limited the language of the contract; it might be by striking on a rock, or by excessive heat so as to open some of the upper timbers; these and many more contingencies that might be suggested would let the sea in, but what the parties, I think, contemplated was that any accident (not wear and tear, or natural decay) should do damage by letting the sea into the vessel, that that should be one of the things contemplated by the contract.

"* * * I think the idea of something fortuitous and unexpected is involved in both words, 'peril' or 'accident'; you could not speak of the danger of a ship's decay; you would know that it must decay, and the destruction of the ship's bottom by vermin is assumed to be one of the natural and certain effects of an unprotected wooden vessel sailing through certain seas."

In *Olympia Canning Co. v. Union Marine Ins. Co.*, 10 F. (2d) 72, C. C. A. 9 (1926), the facts were as follows: A vessel on a voyage from Olympia via Tacoma to Seattle took on a cargo at Tacoma. The district judge found that the cargo was improperly stowed and that when the vessel, after leaving Tacoma, reached a point in Commencement Bay where certain well-known tidal currents exist and a current caused by the waters of the Puyallup river emptying into said

bay, her master brought her wheel over one-half a point to change her course, whereupon the vessel suddenly took a list to port, then gradually went over to starboard, and capsized and sank; that at that time the surface of the water was calm, the weather was fair and clear, and the listing and capsizing were caused by the vessel being in a topheavy and unfit condition, owing to the improper manner in which the cargo taken on at Tacoma was stowed, and was not caused by perils of the sea or any other perils or risks covered by the insurance contract. The Court of Appeals, in an opinion by Circuit Judge Gilbert, accepted these findings, but held, nevertheless, that the accident was caused by a peril of the sea. The court first called attention to certain provisions of the English Marine Insurance Act of 1906 as follows:

"Rule 7 of the first schedule of the English Marine Insurance Act of 1906 provides: 'The term "perils of the seas" refers only to fortuitous accidents or casualties of the seas. It does not include the ordinary action of winds and waves.' Section 55 of the act provides that the insurer 'is liable for any loss proximately caused by a peril insured against, even though the loss would not have happened but for the misconduct or negligence of the master or crew.' The act also provides: 'In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure.' "

After an extensive review of the English authorities the court concluded:

"Guided thereby, we reach the conclusion that by the maritime laws and customs of England the loss in the case at bar was proximately caused by the overturning of the vessel under the impulse of tidal and river currents, altho the accident would not have occurred but for the negligent loading

of cargo taken on board at Tacoma; that the overturning of the vessel was a peril of the sea within the provisions of the insurance contract; and that the action of the sea was the immediate cause of the accident.''

In *James A. McAllister & Co., Inc., v. Western Assurance Co.*, 218 App. Div. 564, 218 N. Y. S. 658, 1927 A. M. C. 104, it appears that a barge owned by the plaintiff sprang a leak while unloading coal into another vessel. The unloading was in charge of a stevedore not employed by or under contract with the assured, and the assured had no control over him. The method of unloading was faulty and was the cause of the leak and consequent damage to the barge. The court held in a well-considered opinion, that the loss was due to a peril of the sea. Referring to *Olympia Canning Co. v. Union Marine Ins. Co.*, supra, it was said:

"The Circuit Court of Appeals assumed that the capsizing of the vessel was due to her tender condition caused by improper loading at the intermediate port, and that this condition rendered her unable to withstand 'well known tidal currents' and currents of a 'river emptying into the bay' (both usual and ordinary currents usually encountered and which were necessarily to be anticipated and therefore not in themselves perils of the seas or insured against)."

The court said further:

"I reach the conclusion, based on the foregoing cases and the others discussed in the opinions therein, that it is not necessary that there should be the action of the sea, wind or waves, violent or otherwise, to cause a peril of the sea, but that a truly accidental occurrence, peculiar to the sea, such as the entry of the sea water through the seams of a vessel, which have opened, or through

a hole in her hull (neither occurrence happening through design) constitutes a peril of the sea, within the meaning of a policy of marine insurance.''

In *Lesicich v. North River Insurance Co. (Helen L.)*, 191 Wash. 305, 71 P. (2d) 35, 1937 A. M. C. 1170, it appears that the captain of a fishing vessel intended to order the engineer to back up by giving the customary signal of two bells. After one ring the bell cord broke, and the engineer, instead of backing up, went forward and the propeller of the vessel fouled the fishing nets, resulting in damage. The court held that the damage was caused by a peril of the sea, citing the cases of *The Xantho, Hamilton Fraser & Co. v. Pandorf, Olympia Canning Co. v. Union Marine Ins. Co.*, and *McAllister & Co., Inc., v. Western Assurance Co.* Concluding, the court said:

''From the foregoing English and American cases we conclude that the breaking of the bell cord started the succession of events which, because they were at sea, resulted in the damage. What caused the bell cord to break is unknown as it was apparently all right until it broke, but we are not to inquire beyond the fact of the breaking. The breaking of the bell cord at the instant it did caused a signal to the engineer the opposite of that intended. Had it caused the vessel to go forward into a rock or a pier, when intending to back away from it, it would have been most unquestionably a 'peril of the sea'. The vessel having been found to have been seaworthy when the voyage commenced, under all authorities, that condition is presumed to continue until the contrary is shown.''

In *Western Assurance Company v. Chesapeake Lighterage & Towing Co.*, 105 Md. 232, 65 Atl. 637, 11 Ann. Cas. 956, a scow made fast to the wharf slipped

away and drifted out into the stream with no one aboard. The captain called a tug and got aboard her. A swell from a passing steamboat struck her. This and a "right smart" wind caused the cargo to shift and upset the scow. There was a claim that the scow was unseaworthy. This was held for the jury, and, if the jury found that she was seaworthy and that the accident was caused by the rolling of the scow produced by the wind and the swell made by the passing vessel and the consequent shifting of the cargo while the scow was adrift and not by unseaworthiness, they could find that the accident was caused by a peril of the sea.

*Zillah Transportation Co. v. Aetna Insurance Co.*, 175 Minn., 398, 221 N. W. 529, is also a case in which there was no unusual action of the winds or waves,— the vessel sank from leakage in a calm sea—but the court held, nevertheless, that the evidence made a jury question as to whether the vessel was lost by a peril of the sea.

The defendants cite the cases of *Western Assurance Company of Toronto, Canada, v. Shaw*, 11 F. (2d) 495 (C. C. A. 3), and *Boat Service Company v. National Union Fire Ins. Company*, (La. App.) 191 So. 707. In the former case a barge sank in the Delaware river while moored to a wharf. The barge was loaded with boilers, which rolled to starboard when the vessel listed and caused or hastened her sinking. The evidence showed "want of ordinary care and skill in loading and stowing" the boilers, an event especially excepted by the terms of the policy from the risks insured against. There was a claim that the barge was caused to roll by waves from a passing steamer, but as that was a "normal, customary circumstance" it was held not a peril of the sea. The vessel involved in

*Boat Service Company v. National Union Fire Ins. Company,* supra, was a motorboat which was undergoing repairs and sank when water from the river entered a disconnected exhaust pipe, the outer end of which was partially submerged. The court followed *Western Assurance Company of Toronto, Canada, v. Shaw,* supra, in holding that ordinary waves from passing vessels are not perils of the sea, and determined on the facts that the casualty was caused by the unseaworthy condition of the boat "because of the negligent manner in which the exhaust pipe had been disconnected and blocked up". It was further held that there could be no recovery under a clause of the policy insuring against perils resulting from the "negligence of master, charterers, mariners, engineers, or pilots", because the petition contained no allegation that the loss resulted from any such negligence.

We will not attempt to determine whether these cases are opposed to the others to which we have referred, or whether substantial grounds of distinction might not be found. In so far, however, as they hold that waves from a passing vessel are not perils of the river, we think that they unquestionably accord with everything that has been written upon the subject. It is one thing to say that where a vessel founders as a result of a *casus fortuitus* such as negligent loading, the giving of a wrong signal, or a collision with another vessel, it is a victim of a peril of the sea. It is quite another to say that conditions of the sea or river ordinarily encountered are perils within the meaning of the policy. The peril is the accidental occurrence "peculiar to the sea", *James A. McAllister & Co., Inc., v. Western Assurance Co.,* supra. No authority has been cited which supports the view that

ordinary waves from a passing vessel are perils of the river. The *Warren Adams,* 74 Fed. 413, to which the plaintiff calls our attention, does not so hold. The vessel in that case "encountered bad weather from the first night of her voyage until she sprang the leak", 74 Fed. 414. And in those cases in which, though no extraordinary or overwhelming action of the wind or waves caused the accident, the loss was held to have been due to a peril of the seas, it was the sea itself which did the damage.

■ In the instant case, as it seems to us, there is no evidence of loss caused by a peril of the river. The damage to the vessel was caused either by the negligence of the independent contractors or by latent defects in the hog chains. It cannot be said, as the plaintiff suggests, that the fortuitous circumstances was "the passing of a steamer at the moment causing large displacement waves". A common occurrence such as waves from a passing vessel, which in Klepp's words, "we have to contend with all the time", is scarcely to be considered a fortuitous circumstance. On the contrary, it is something to be expected and guarded against. The fortuitous and unexpected event was the breaking of the hog chains. The waves may have contributed to that result, but, if so, it was because the hog chains were defective or the vessel was improperly blocked—not because the waves were perils of the river.

It was therefore error, in our opinion, to instruct the jury, as the court did, that "among perils of the rivers and other like perils there is included the waves and swells, whether the same be caused by wind or storm, or by a passing vessel", and error to submit to the jury the question whether the damage to "The Dalles" was caused by a peril of the river.

■ We are thus brought to the question whether the circuit court should have ruled as a matter of law that the damage to the vessel was caused by the negligence of the independent contractors in failing to block the vessel adequately. While we are dealing with a type of case not usually tried in the state courts, we take it that the ordinary rule applies, that if the evidence is conflicting the question is for the jury—not the court.

It is the defendants' contention that it was negligence for those in charge of the work not to have placed blocks under the after part of the vessel while it was still afloat and the bow was resting on the ways. This is said to have been a necessary precaution to have been taken because of the added strain on the hog chains while the vessel was in that position. That there would be an added strain must be conceded, because the stern of the vessel was then without the support which it has when water-borne, the buoyancy of the vessel being approximately in the middle.

■ Klepp testified that the time to begin driving in blocks from the sides is ''as soon as the after part of the ship begins to lift over the original water line'' and ''we had pulled this particular boat up and had her to about that point (indicating), and then one of the hog chains busted.'' What he indicated we have no means of knowing, but, under the authorities in this state above cited dealing with unintelligible records, we are not to assume that the evidence was unfavorable to the plaintiff. The whole of the evidence—diagrams, gestures, and all—was before the trial judge, and his decision was in favor of its sufficiency, as was the jury's. We are obliged, therefore, to take Klepp's testimony as meaning that the hog chain broke

just at about the time it was proper or feasible to commence driving in the blocks.

■ A jury could have found from Klepp's testimony that in the method he used to haul "The Dalles" out of the water he was following the approved and common practice, and, as he is a man of many years experience in that kind of work, the conclusion that he did not act negligently could legitimately have been drawn. The technique of such an operation is not within the knowledge of the general run of people. The customary way of performing an act may aid a jury in determining whether or not it was negligently performed, and, while the customary way, it is true, does not establish the standard of conduct as a matter of substantive law and would not be a ground of exoneration if found to be a negligent way, still it is competent evidence on the question whether ordinary care in the circumstances was exercised. *Silver Falls Timber Co. v. Eastern and Western Lumber Co.*, 149 Or. 126, 177, 40 P. (2d) 703.

■ The testimony of Captain Ray Passmore, of "The Dalles", who was present while the work was going on, was to the effect that he warned Klepp against hauling the boat out of the water without putting blocks under the stern, and that it was insufficient blocking which caused the hog chains to break. If the jury had accepted his testimony they would have been justified in returning a verdict for the defendants. Likewise, there are circumstances in evidence, to which specific reference need not be made, which would have warranted a finding of negligence on the part of the independent contractors. But, in our opinion, the case is one of conflict in the evidence, to be resolved by the jury.

■ It is said that there is no evidence that the hog chains were defective, and various reasons are advanced in support of this assertion. But we are dealing with a motion for a directed verdict, and the only ground of that motion relating to the condition of the hog chains is that "there is no evidence that the defect came into the hog chains except through the acts of the plaintiff or some one representing the plaintiff in making the welds". It thus appears that in the court below the defendants practically conceded the existence of defects in the hog chains while urging a matter in that regard that is not repeated here. On the other hand, the contentions now relied on are made in this court for the first time and were not assigned as grounds of the motion in the circuit court. They are not, therefore here for our consideration. *Blue v. City of Union,* 159 Or. 5, 19, 75 P. (2d) 977.

The same disposition must be made of the contention that the plaintiff failed to prove that the "loss or damage has not resulted from want of due diligence by the Owners of the Vessel, or any of them, or by the managers." A loss due to such a cause is not insured against, and it is claimed that under the undisputed evidence it was negligence for the owners of the vessel not to furnish Ericksen & Klepp with a plan of the vessel which would have enabled them to determine whether the hull was molded or flat; that the plan would have shown that the hull was molded; and that this knowledge would have prompted Ericksen & Klepp to take precautions in hauling the vessel out of the water which otherwise were not taken. But the only negligence assigned as a ground of the motion for a directed verdict was that of the plaintiff through its agents, Ericksen & Klepp, in performing

that work. The negligence of the plaintiff itself, or its managers, was not a ground of the motion.

■■ The defendants also contend that there is no evidence that the damage was "directly caused" by defects in the hog chains. We will not attempt to follow counsel through the elaborate argument which has been submitted upon this point. It all seems to us to be a question of proximate cause, which is ordinarily, and we think in the present case, a question of fact. We do know that the hog chains parted, and immediately thereafter the stern of the vessel was let down and steam lines, pipes and planks broke. If the jury believed that Ericksen & Klepp were free from negligence it was competent for them to find that the hog chains would not have broken had they not been defective and that the defects, therefore, were the direct cause of the damage. If, on the other hand, the jury believed that Ericksen & Klepp were negligent in failing to block the stern of the vessel and subjecting the hog chains to a strain which they were not intended to bear, they would be authorized to find that this negligence was the proximate cause of the damage. In that event there could be no recovery, because a loss due to the negligence of independent contractors is not covered by the policy. *Read v. Agricultural Insurance Co.*, 219 Wis. 580, 263 N. W. 632.

If it be true, as the defendants urge, that a portion of the damage could not, under any view of the evidence, have resulted from defective hog chains, that would not be a ground for a directed verdict, and the proper way to have raised that question was by a motion to withdraw evidence from the consideration of the jury. No such motion was made.

As stated, one of the grounds of the motion for a directed verdict relates to the proof of loss. Under date of September 8, 1938, the plaintiff submitted to the underwriters a document (which was introduced in evidence by the defendants) entitled "Hull Insurance Claim Str. 'The Dalles' ". It is addressed to Captain Tucker, Board of Marine Underwriters, and Addison P. Knapp Co., insurance agent, and reads:

"Str. 'The Dalles' left Portland at 11:25 A. M. August 3, 1938 for Ericksen & Klepps shipyards at Rainier, Oregon for the purpose of having some minor repairs made to her hull.

"When 'The Dalles' was being hauled out of the water apparently insufficient blocking was used with the result that the hog chains let go, breaking a number of ribs and doing considerable damage to steam lines, boiler, etc."

The foregoing is followed by an itemized statement of the damage claimed to have been sustained.

■ The defendants argue that the plaintiff ought not to be permitted to give evidence of damage caused by perils of the river and latent defects in the hull after having attributed the damage in its proof of loss to "apparently insufficient blocking". It is said that the contents of the proof cannot be corrected or denied for the first time at the trial of an action on the policy, and cases are cited which appear to support that contention. Whether they are in accord with the law in this state may be doubted in view of *Fagerlie v. New York Life Insurance Company,* 129 Or. 485, 278 P. 104. But we need not decide that now for the following reasons: The policies contain no express requirement of proof of loss as a condition precedent to an action upon them. They seem to be drawn, as are English marine

policies in the common form, which "do not appear to contain any express provision as to preliminary proof, or the time of payment for a loss." 2 Phillips on Insurance (5th Ed.) 466, § 1800. They do contain the following provision:

"In the event of accident whereby loss or damage may result in a claim under this Policy, notice shall be given in writing to the Underwriters, where practicable, prior to survey, so that they may appoint their own surveyor if they so desire."

The testimony shows that on August 4, 1938, the day after "The Dalles" was damaged, Captain Robert W. Tucker, surveyor for the Board of Marine Underwriters in San Francisco, went to Rainier and, in behalf of the defendants, made a survey of the damage done to the vessel. It does not appear, except possibly by inference, whether the plaintiff notified the underwriters of the accident in writing or otherwise. But that is not material, for they received the notice from some source and acted upon it. The purpose of the provision was completely fulfilled, namely, to enable the underwriters to "appoint their own surveyor if they so desire", and that is what was done.

Beyond this, no issue is made in the pleadings as to the proof of loss. The plaintiff alleged in its complaint that "more than six months prior to the institution of this action, plaintiff filed with the defendant its proof of loss and defendant has failed and refused to reimburse plaintiff for said damage in accordance with the terms of the policy," and each of the defendants admitted "that plaintiff filed with the defendant its proof of loss and that the defendant has failed to reimburse plaintiff for said damage." The allegation in the complaint is to be properly construed as having reference to proof of a loss sustained

in the manner described in the complaint, and the defendants' admissions preclude them from raising the objection under consideration. Had an issue been made in the pleadings on that question, other facts might have been shown which would have materially affected its determination. The document of September 8, 1938, was admissible in evidence as a declaration against the interest of the plaintiff; it cannot be given any further effect.

There are other assignments of error, relating to instructions and the admission of evidence, but, in view of the disposition to be made of the case, we find it unnecessary to discuss them. We deem it appropriate, however, to call attention to an error in the instructions, not excepted to, but which should be avoided on another trial. The court told the jury in substance that the defendants had the burden of proving by a preponderance of the evidence that Ericksen & Klepp were negligent in failing to provide adequate blocking and that such negligence was the proximate cause of damage to the vessel. We think that the charge does not correctly state the law. The burden was on the plaintiff throughout the case to prove that the loss resulted from a cause insured against, and the defendants' affirmative answers did not have the effect of shifting that burden. The evidence adduced to show negligence on the part of Ericksen & Klepp was admissible under the denial of liability. *Automobile Ins. Co. of Hartford, Conn., v. Central Nat. Bank, Savings & Trust Co.*, 24 F. (2d) 619 (C. C. A. 6th); *Kelly, Weber & Co., Ltd. v. Franklin Fire Ins. Co.*, 43 F. (2d) 361 (D. C.). As stated in the former case:

"The ultimate burden did not shift by reason of the evidence of scuttling presented by defendants; that evidence was not offered in support

of any affirmative defense because there was none. It was offered to sustain the denial of liability, to raise at least a question in the jury's mind as to whether or not the sinking was in fact due to a peril covered by the policies. It bore only upon the question as to whether or not plaintiff's had affirmatively made out their case of liability under the policies.''

No motion was submitted to withdraw from the jury the issue as to perils of the river, but the instruction defining such perils was duly excepted to, and, since it was erroneous and prejudicial, is ground of reversal.

The judgments appealed from are reversed, and the cause remanded for further proceedings not inconsistent with this opinion.