Argued May 6, affirmed August 13, 1952

# ROBERTSON *v.* COCA COLA BOTTLING CO.

247 P. 2d 217

*S. H. Burleigh,* of La Grande, argued the cause for appellant. With him on the brief was James Arthur Powers, of Portland.

*Charles R. Cater,* of La Grande, argued the cause for respondent. With him on the brief were Leland F. Hess and Clayton Hess, of Portland.

Before BRAND, Chief Justice, and HAY, LATOURETTE, WARNER, and TOOZE, Justices.

BRAND, C. J.

This is an action for damages brought by the plaintiff, an employee of a hotel company against the Coca Cola Bottling Co., on account of personal injuries caused by the explosion of a glass Coca Cola bottle. The verdict was for the defendant, but thereafter, the court upon motion of the plaintiff, set aside the judgment and granted a new trial. The defendant appeals. The allegations of the complaint may be briefly summarized as follows:

The hotel company was purchasing under contract from the defendant a Vendo-83 coin control cooler for Coca Cola, No. F-9505 and had also purchased a number of bottles of Coca Cola to be vended from said machine. The duty of the plaintiff was to keep a supply of Coca Cola in the machine. The defendant was engaged in the business of bottling and selling Coca Cola in glass bottles "highly charged with carbonic acid gas or carbon dioxide." The plaintiff, while pursuing her duty, opened the vending

machine for the purpose of filling it, when one of the bottles in the machine ''without having been touched by the plaintiff exploded'', propelling the jagged top of the bottle at the plaintiff, with the result that her face was cut and permanently scarred. The defendant knew, or should have known, ''that any defect in bottles or increase in the pressure under which said bottles were filled would make said bottles likely to explode and dangerous to those persons who might come into proximity therewith.'' The defendant was negligent in its duty to the plaintiff:

> ''* * * by selling a bottle of said beverage which, on account of excessive pressure of gas or by reason of some defect in the bottle was dangerous as aforesaid and likely to explode and to cause injury to any person handling it or being near it; that said dangerous defect was latent, was not known to the plaintiff, and was known or by the exercise of reasonable prudence and care on its part should have been known to the defendant.''

The complaint continues by stating that the plaintiff cannot more specifically allege the negligent acts of the defendant which are peculiarly within its knowledge and that the plaintiff:

> ''* * * will not be confined to the specific acts of negligence charged but will rely on the general allegations of explosion and defectiveness and overcharge of said bottle of Coca Cola with carbon dioxide or carbonic acid gas or other substance which is and was highly explosive.''

For the purposes of this case, the answer is a general denial.

 The order for a new trial recites in general terms that error was committed materially affecting the rights of the plaintiff. Under our decisions, if that order ought to be supported on any of the grounds

specified in the motion therefor, it should be sustained regardless of the reason, or absence of reason, given by the trial court in the order. *Johnson v. Updegrave,* 186 Or 196, 206 P2d 91; *Zeek v. Bicknell,* 159 Or 167, 78 P2d 620. In considering whether the court erred in granting a new trial, all intendments are in favor of the order of the trial judge. *Arthur v. Parish,* 150 Or 582, 47 P2d 682. The order granting a new trial was made more than 30 days after entry of judgment and was based upon motion of the plaintiff. Consequently, the trial court was controlled by OCLA, § 5-804:

"In all cases of motion for a new trial, the grounds thereof shall be plainly specified, and no cause of new trial not so stated, shall be considered or regarded by the court. * * *"

Our duty upon appeal is therefore to determine whether the trial court committed error in any particular specified in the motion for a new trial. The motion for a new trial is based upon:

"Prejudicial errors of law occurring at the trial and excepted to by the plaintiff in the following particulars:

"(a) Admission of the testimony of Mr. Williams with reference to the strength, testing of, and ability of Coca Cola bottles to withstand thermal shock. Said testimony appearing at the time of trial to be entirely hearsay in that the said Williams admitted from the stand that he knew nothing of the subject on which he testified except as was learned from a report with reference to explosions of Cola Cola bottles and that by reason thereof the plaintiff was deprived of the right of cross-examination.

"(b) Denial of plaintiff's motion to strike from the record and instruct the jury to disregard Williams' testimony with reference to the aforesaid matters upon the ground that the same was hearsay

and that by reason thereof the plaintiff was deprived of the right of cross-examination.

"(c) Admission of the testimony of Williams and Fouts that the method of inspection used by the defendant company was the same as that used by bottlers of Coca Cola generally.

"(d) Admission of testimony of Williams that he had travelled all over the United States and the methods of inspection used by them were universal.

"(e) Admission of testimony of Lust and Williams that this was the first time they had ever heard of a bottle of Coca Cola exploding and the further admission of testimony that this was the first claim ever filed against the defendant company.

"(f) Modification of the rule of res ipsa loquitur by the court's insertion in its instruction of the words 'at your option' and inference may arise although no formal exception was taken."

The question raised by the first assignment of error is whether the trial court erred in admitting the testimony of witness Williams, the defendant and appellant, contending that no error was committed in that respect. The witness was vice president and general manager of the defendant corporation. He had been connected with the Coca Cola company for 24 years and had visited practically every Coca Cola bottling company in the United States. He had also visited companies which manufactured the bottles. He testified:

"Q And in your work have you made a study of the bottles, and their structure, and breaking strength?

"A Not particularly. I watched them make them. I know some of the pressures they are subjected to and what they will stand.

"Q You have read articles on the different ——

"A (Interrupting) Yes."

This is substantially the extent of his preliminary qualification as an expert. He then testified:

"Q (MR. BURLEIGH) You are familiar with other beverage bottles in weight and construction, like 7-Up and so on?

"A Yes.

"Q Of the beverage bottles, how does the coca cola bottle rank in strength and weight with the others?"

A general objection was interposed and overruled. The witness answered:

"Well, other beverage bottles, in general run as heavy—not as strong, as coca cola bottles.

"Q I believe you said it is the heaviest bottle?

"A It is the strongest bottle in the beverage business."

The interrogation continued:

"Q Do you know the thickness of the glass in a coca cola bottle?

"A I have it here.

"Q You have figures showing it?

"A Yes.

"Q Will you give us the thickness of the glass?"

Objection was made that the witness was not testifying from his own knowledge and that plaintiff was attempting to introduce hearsay. The witness then testified that he had in his possession "a paper showing the dimensions, thickness of glass, in coca cola bottles, and the pressure in the bottles at different temperatures, and tests on the pressure necessary to break the bottles." The paper was not prepared for the defendant company. It was prepared by Dr. H. E. Fulcher of Davidson College upon experiments and physical tests of Coca Cola bottles. The former objec-

tion was renewed; "This is an attempt to produce a witness we don't have a right to face," etc.

"Q (THE COURT) Is that circulated through the coca cola plants and coca cola trade, and available ——

"A (Interrupting) Yes.

"Q (THE COURT) And recognized as an authoritative source of information on the contents — — —?"

An objection was interposed and overruled, but the question propounded by the court as to whether the document was recognized as an authoritative source of information was never answered. In his written opinion on the motion for a new trial the trial judge states:

"There is no question in the Court's mind but that the Court was under the impression that the witness had answered the second question in the affirmative. The record, however, shows that he did not answer; and right at that instant counsel for the plaintiff interposed an objection. (See p. 6 hereof). But actually, as the record stands, there is no evidence that this treatise by Professor Fulcher of Davidson College is a trustworthy authority on the subject. No other qualifying questions were asked. The treatise writer must, like any other witness, be shown beforehand to be properly qualified. In Wigmore, 3d. Ed. Vol 6, Sec. 1694, pp. 8-9, the following statement is made:

" 'The treatise-writer must, like every other witness, be shown beforehand to be properly qualified to make statements upon the subject in hand. This will require, as in other Hearsay exceptions, another witness who will testify to these qualifications,—which means here the summoning of any one in the profession, art, or trade of the writer and ascertaining from him the writer's standing as an author-

ity. This removes the danger of an ignorant use of statements by writers of no standing; but it is merely the application of the general principle as to testimonial qualifications.'

"The Court was in error in admitting this testimony. There is no question in the Court's mind but what this evidence had a profound effect on the minds of the jury; and for the foregoing reasons the motion for new trial will be allowed."

The testimony of the witness Williams was in part as follows: In answer to questions propounded, and over repeated objections, he testified concerning the measurements of a Coca Cola bottle, including the thickness of the glass in different portions of the bottle. The witness was asked to, and did give this testimony, in answer to the following question: "From your study of that, [referring to the Davidson College document] what thickness do you find the coca cola bottle has, * * *?" He further testified that Coca Cola bottles are built to withstand a minimum of 430 pounds per square inch and that at room temperature the pressure ranges fom 33.2 to 34.6 pounds per square inch. He testified that if the temperature goes down the pressure reduces. The witness testified further concerning the measure or volume of gas in carbonated water. In answer to an inquiry as to what volume of gas you place in Coca Cola he answered, "It is rumored that coca cola at its best is 3-½ volumes of gas, although we have a range of 3.2 to 3.8." The witness also testified that at 36 degrees there is about 25 or 26 pounds pressure in a Coca Cola bottle. On cross-examination the witness testified as follows:

"Q Do you know anything about glass making?
"A I have only seen it twice.

"Q You are not skilled in the process of glass manufacture?

"A No.

"Q You don't know what the components are, do you?

"A No, I don't.

"Q Do you know the method used in forming the bottle from the components?

"A I have watched them. It is molten glass made out of sand and goes into various molds, but that is all I could tell you.

"Q The air pressure is introduced into the mold inside the molten globule of glass which presses it against the side of the mold and it takes the shape we see as the exhibit here? Is that not the case?

"A I think that is right.

"Q And there is nothing to determine the thickness of the side walls there except the amount of the material that is introduced into the mold, then subjected to the pressure of the air inside; is there?

"A I could not answer that. I am not sure.

"Q It is possible, is it not Mr. Williams, that sometimes bottles are thicker on the one side than on the other; the molten mass having been deposited, or flowed, more to one side than the other? Is that not the case?

"A I don't know.

"Q Do you know anything about the internal stress in glass,—of glass bottles?

"A You mean as to what they will stand?

"Q As to the existence of them—the method of determination, the cases and the result?

"A No, I don't.

"Q Do you know anything about the method of inspection used by the people that manufacture the glass?

"A No, I don't.

"Q Or the bottles?

(No response)

"Q Now, the figure that you gave on Mr. Burleigh's questioning; I think you said these bottles will stand a minimum of 430 pounds internal pressure; is that correct?

"A Yes, sir.

"Q That is a new bottle, isn't it, Mr. Williams?

"A I will have to look. I am not sure.

"Q You are not testifying, then, from your own knowledge?

"A No. We get our information from them, as to what pressures there are in a bottle. We can allow ourselves so much pressure in a bottle.

"Q From whom is your information?

"A The 430 pounds is from Davidson College.

"Q For whom did they make the tests?

"A I don't know. This has no identification, other than they made experiments and physical tests on coca cola bottles, with reference to explosions.

" * * * * * *

"Q You know, of your own knowledge, nothing about the facts contained, or the truth of the alleged facts contained in the paper you have in your hands, do you?

"A No. I have every reason to believe it. I know of other universities that have made types of tests on other bottles. I know the University of St. Louis recently tested 7-Up bottles. There are experiments of that kind going on in colleges in all types of containers."

After further cross-examination the plaintiff made the following motion which was denied:

"If the Court please, we move to strike Mr. Williams' testimony with reference to the material contained in this document, or exhibit, and all testimony which he has given, in that he furnishes it not from his own knowledge, and from hearsay; on the gound that it is incompetent, and we have not had an opportunity to inquire from the person who allegedly compiled the information, the condi-

tions, manner and how it was done, and all the things in which the jury would most certainly be interested.''

The record demonstrates that the plaintiff, both by objection and by motion to strike, adequately presented to the trial court his objections to the testimony of the witness, insofar as it was based upon the Davidson College document.

It is provided by statute that a witness "can testify of those facts only which he knows of his own knowledge, that is, which are derived from his own perceptions, except in those few express cases in which his opinions or inferences, or the declarations of others, are admissible." OCLA, § 2-203.

■■ The "express cases" in which opinions are admissible, so far as concerns us here, are enumerated by statute. The opinion of a witness is admissible "on a question of science, art, or trade, when he is skilled therein;" OCLA, § 2-228, par (9). Counsel for the defendant concedes that the introduction of scientific books and treatises in evidence is generally prohibited; "such books and treatises generally are not admissible *in evidence* as proof of the facts stated therein." See 20 Am Jur, Evidence, § 797. There is no evidence that the Davidson College document was recognized as an authoritative source of information. It was itself inadmissible. The witness testified as to its contents and not as to his personal knowledge. Much of the testimony was in no sense the opinion evidence of an expert. It consisted of statement of alleged fact, based upon measurements made by third parties. The so-called statistics from the Davidson College report did not constitute the kind of scientific data, the admissibility of which, when established as authentic, is favored by Professor Wigmore. Wigmore on Evi-

dence, 3d ed, § 1690 et seq. The figures were the result of specific measurement and testing of a particular type of bottle. The court erred in admitting the evidence and did not err in granting a new trial by reason of its admission.

Since the case may be tried again, we will take note of certain other alleged errors.

■ The court received evidence to the effect that the method of processing and inspection used by the defendant company was the same as that used by bottlers of Coca Cola generally. The plaintiff correctly states that usage of the trade, or custom, does not justify negligence, nor does a practice in strict compliance with usage establish as a matter of law that the practice is non-negligent. But, although the customary practice in a business or trade is not the legal measure of due care, this court has firmly established the rule that evidence of such custom or practice, while not controlling, may be considered by the jury, together with other evidence, in determining whether the acts done were negligent. *Myrtle Point Transp. Co. v. Port of Coquille River,* 86 Or 311, 168 P 625; *Hise v. City of North Bend,* 138 Or 150, 6 P2d 30; *Silver Falls Timber Co. v. E. & W. Lbr. Co.,* 149 Or 126, 40 P2d 703; *Shaver Co. v. Eagle Star Ins. Co.,* 172 Or 91, 109, 139 P2d 769.

■■ It is suggested that the evidence of custom or usage was inadmissable because not pleaded. When evidence of usage is offered only for the purpose indicated, it is no more necessary to plead it than to plead any other circumstance relative to the existence vel non of negligence. When there is no absolute standard of care fixed by law, evidence of what is usual is often of value as an assistance to the court or jury in determining the issues upon a charge of negligence. When

usage is offered for the purpose of establishing certain implied terms of a contract, a different problem is presented. *Simms v. Sullivan,* 100 Or 487, 198 P 240, was of the latter type. It is not in point here. No error was committed in the receipt of this evidence.

It is contended that the court erred in permitting agents of the defendant to testify that they had never before heard of a bottle of Coca Cola exploding, and that there had never before been a claim filed against the company. There is a conflict of authority upon this question. 38 Am Jur, Negligence, § 315, p 1014; 128 ALR 606, Note. However, this court has at least once indicated its adherence to the rule of admissibility. In *Briggs v. John Yeon Co.,* 168 Or 239, 122 P2d 444, we said:

> "* * * That other persons had used the floor without mishap is evidence in conflict with the truth of plaintiff's claim, and would warrant an inference that the floor was in a reasonably safe condition, but it would be for a jury to say whether it overcame the force of the sworn testimony on behalf of the plaintiff and the reasonable inferences therefrom. * * *"

Where, as in this case, it is alleged that the defendant knew, or in the exercise of reasonable care should have known of the danger, we think such evidence is admissible.

In *Howe v. Jameson,* 91 NH 55, 13 A2d 471, the court said:

> "The defendant's duty to anticipate an accident was in issue. On the issue evidence of ignorance of dangerous conditions was competent in defense. And lack of notice of accidents therefrom to one who would naturally have notice of any occurring was relevant to show his ignorance. Without knowledge of dangerous conditions the duty of anticipation

might be found not to exist, whereas with it the duty might be charged.''

Again we quote:

"*** * * Evidence of the absence of prior accidents resulting from the same physical defect or inanimate cause, under substantially similar circumstances, is admissible to prove that such defect or cause was not dangerous or likely to cause such accidents, and further to prove that the person responsible for the defective condition was not reasonably chargeable with knowledge of its dangerous character. * * *'' *Nubbe v. Hardy Continental Hotel System of Minn.*, 225 Minn 496, 31 NW2d 332, 335.

And see Sherman and Redfield, rev ed, § 59.

The order of the circuit court granting a new trial is affirmed.