Argued October 11, 1972, reversed with instructions
January 25, 1973

LEWIS ET AL, *Appellants and Cross-Respondents, v.*
AETNA INSURANCE COMPANY,
*Respondent and Cross-Appellant.*
505 P2d 914

*Robert E. Nelson,* Portland, argued the cause for appellants and cross-respondents. With him on the briefs were McCarty & Swindells, Portland.

*Edwin J. Peterson,* Portland, argued the cause for respondent and cross-appellant. With him on the brief were Tooze, Kerr & Peterson and Farrand M. Livingston, Portland.

DENECKE, J.

Plaintiffs are the owners of a 46-foot Chris-Craft, the Manatee. The defendant carried hull insurance on the Manatee which was evidenced by a "yacht policy." The boat was found sunk in its boathouse on the Columbia River. It was raised and repairs were commenced. Plaintiffs brought this action for the cost of repairs. The jury returned a verdict for the plaintiffs, but the trial court set it aside and entered judgment for defendant. Plaintiffs appeal.

Plaintiffs contend the damage was covered under the clause insuring against damage caused by the "Bursting of boilers, breakage of shafts or any latent defect in the machinery or hull * * *." This clause has been in hull policies for over 80 years and is referred to as the "Inchmaree Clause" after the vessel whose uninsured loss brought about the inclusion of such coverage in the hull policy. The plaintiffs contend a latent defect caused the loss.

The evidence is that the Manatee sunk because of leaks in the hull; however, the cause of the leaks is unknown. The issue is whether from this evidence the jury can infer that the leaks were caused by a "latent defect" within the meaning of the Inchmaree Clause.

A witness testified that leaks were in the seams on the sides of the keel; however, he could not determine why the leaks occurred. He could not find any rotten wood in this area. He put in some caulking, but not along the entire seam where it was leaking. The witness was of the opinion that the caulking was not deficient. The boat was put back in the water and each day less water came in until eventually she became tight without any repairs to the seam. The only possible explanation for her recovery was that the space between the seams filled with silt from the river or "gunk" from the bilge.

The Manatee was 21 years old but was an expensive boat, of good construction and in good condition. The expert called by plaintiffs testified: "* * * [W]ith a boat of this age, it would probably be not too common that something like this would happen." The Manatee's last cruise before she sank was on December twenty-seventh. About January first one of the plaintiffs showed the Manatee to friends and she appeared in good condition. The vessel was found sunk on January fourteenth.

■ In determining whether there was sufficient evidence we start with the premise that the insured has the burden of proving that the loss was caused by a peril insured against. *Shaver Co. v. Eagle Star Ins. Co.,* 172 Or 91, 114, 139 P2d 769 (1943). In the instant case there is no direct evidence that a latent defect caused the loss. The problem, reduced to its fundamentals, is whether the circumstantial evidence raises a strong enough inference of loss because of latent defect that the issue should be submitted to the jury.

The problem is the same whether the insured is contending that the loss was caused solely by a latent

defect or by some other peril insured against in a hull policy such as the perils of the sea or of the rivers. In most of the cases the insured is claiming that the loss was caused by several perils, alternatively or cumulatively.

*Massey S.S. Co. v. Importers' & Exporters' Ins. Co.,* 153 Minn 88, 189 NW 415, 31 ALR 1372 (1922), is a leading older case holding that if there is evidence that the ship is seaworthy, and there are no other apparent causes for the loss, the jury may infer that the loss was caused either by the perils of the sea or a latent defect. The vessel was a lake freighter with a wooden hull and was built in 1891. In 1918 it was thoroughly repaired, inspected by the American Bureau of Shipping in March 1919, and approved. On her second voyage thereafter she encountered a gale, but rode well. On the third, she sprang a leak which the pumps could not handle and she sank. There was a possibility she hit an underwater object when unloading at the end of her second trip; however, the plank that was possibly stove in did not admit water until the rougher water of Lake Superior was encountered. This later theory, however, the court stated, "rests on no substantial foundation of fact." 153 Minn at 92. The court held there was sufficient evidence for the jury to find the loss was covered.

This same reasoning was followed 35 years later by Judge John R. Brown, writing for the court in *Tropical Marine Prod. v. Birmingham Fire Ins. Co. of Pa.,* 247 F2d 116 (5th Cir 1957). The Sea Pak was a wooden vessel, probably built during World War II. It was completely overhauled in the summer of 1953. She was fishing in calm waters in the Bahamas. She sprang a leak which became progressively worse. The

place where she leaked was inaccessible. The master tried to bring her back to harbor through waters that were not unusual; however, she sank.

No evidence of the specific cause of the leak was introduced. The court reversed the trial court and held that the loss must have been caused either by the perils of the sea or a latent defect.

*Glens Falls Ins. Co. v. Long,* 195 Va 117, 77 SE2d 457 (1953), is to the same effect. The insured bought a new 19-foot Higgins runabout in July 1948. The boat was moored in the James River the balance of the summer and stored in a garage in the winter. The next May the hull was examined, the rough spots sanded and a coat of lead paint applied. No defects were found. It was carefully returned to the water and again moored in the river. A week later the owner ran the boat about two miles to a fishing spot. When he stopped, the bow settled down after planing. Water commenced coming in at the bow. The boat sank. There was no direct evidence of the cause of the leaks. The court sustained a verdict for the insured, commenting:

> "This boat was shown to have been new, and the testimony tended strongly to establish seaworthiness before and at the time of the trip of June 2, 1949. Within an hour it had filled with water and sunk. This affirmative evidence was uncontradicted in any particular. There was nothing whatever to indicate unseaworthiness unless it be the sudden and unexplained entry of water. The presumption that arose from the affirmative proof was not overcome solely by that fact; and defendant offered no evidence to rebut it. The proof sustains a finding that the boat foundered because of a peril of the sea or from a latent defect, both of which risks were assumed by the insurer." 77 SE2d at 460-461.

The cases cited in the Annotation, "Necessity under marine insurance policy of showing specific cause of sinking of vessel," 31 ALR 1378 (1924), and supplemental decisions are largely in accord in holding that a failure to prove the specific cause of loss is not necessarily fatal to recovery by the insured.

At least one decision is contrary to the above cases. The trial court in *Watson v. Providence Washington Ins. Co.*, 106 F Supp 244 (DC ED NC 1952), acknowledged there was logic in the theory followed by the cases we have cited above but believed the weight of authority was to the contrary and held the insured could not recover.

■ The judge in the *Watson* case was of the opinion that *McKern v. The Corporation, Etc.*, 85 Or 652, 167 P 795 (1917), supported his holding. We do not so construe our decision. The plaintiff in that case owned a "motor boat," and had purchased hull insurance from the defendant. The boat sank and plaintiff sued defendant who alleged in its answer that the boat was lost because it was unseaworthy and plaintiff was negligent. The procedure was peculiar and neither party offered any evidence. The trial court held for plaintiff. This court reversed, holding that the plaintiff could not recover without producing some evidence of seaworthiness before the loss. Some proof that the vessel was seaworthy is always necessary before the trier of fact can draw the inference that it was a latent defect and not some other unseaworthy condition that caused the loss. *Pacific Dredging Company v. Hurley,* 65 Wash2d 394, 397 P2d 819, 827 (1964).

*City M. T. Co. v. Franklin F. Ins. Co.*, 116 Or 102, 239 P 812 (1925), likewise does not support the proposition that the plaintiff cannot recover. There,

the insurer-defendant alleged and introduced evidence that the barge was unseaworthy before the loss and the trier of fact held the owner-insured could not recover. We held there was evidence to support the finding of the trial court that the barge was unseaworthy. In the present case the jury must have found the Manatee was seaworthy prior to the loss, other than the latent defect.

An experienced admiralty attorney described the state of the law in this way:

> "It would be reasonable to think that, with the passage of more than three-quarters of a century, it would now be settled what legal proof is required to establish a claim under the clause for loss of a vessel through latent defect. At least one court requires affirmative proof of the specific insured peril which has caused the loss, while other courts permit recovery for otherwise unexplained sinkings—after proof of due diligence to make seaworthy—saying that such proof raises a counter-presumption that a sinking in calm water is the result of a latent defect or some 'extraordinary although unknown and unascertainable [but insured] peril of the sea.' We may at least hope that, failing cure through more explicit draftsmanship of the clause, the courts will take on themselves the task of working toward uniformity in the proof required to establish a loss under the Inchmaree Clause." Tetreault, *The Hull Policy: The "Inchmaree" Clause*, 41 Tul L Rev 325, 343 (1967).

■ The defendant argued that the Manatee was damaged because it was unseaworthy or because the plaintiffs were negligent in their maintenance of the vessel. The jury apparently found to the contrary. When it has found that the vessel was seaworthy and did not sink because of negligent maintenance, the jury may infer the vessel sank because of a latent defect.

Reversed with instructions to reinstate the judgment.

BRYSON, J., specially concurring.

Plaintiffs are the owners of a 21-year-old 46.4 foot pleasure boat, the Manatee. The boat was insured with defendant under the terms of a "Yacht Policy" which contained an "Inchmaree clause" and provided in part:

"Perils. Touching the adventures and perils which the Company is content to bear and does take upon itself, they are of the seas, rivers, lakes and/or other inland waters, fire, assailing thieves, jettisons, barratry of the Master and Mariners, and of all other like perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage of said Yacht or any part thereof.

"This insurance also specially to cover loss of or damage to hull or machinery directly caused by the following:

"* * * * *.

"5. Bursting of boilers, breakage of shafts or any latent defect in the machinery or hull (excluding, however, the cost and expense of repairing or renewing the defective part);

"* * * * *."

The boat sank at its covered moorage on the Columbia River. Plaintiffs contend the boat sank by reason of a "latent defect," as set forth in the Inchmaree clause. No one knew the reason for the sinking, but an expert marine repairman testified that it was not common for a boat of this age to sink under the circumstances of this case. In other words, once a wooden hull has absorbed water in its planks for twenty-one years and developed no dry rot, it becomes

a sound hull. There was testimony that there was no dry rot in the hull.

The defendant contends "that the 'perils of the sea' clause in Mr. Lewis' insurance policy, of which the Inchmaree clause is a subparagraph, does not create 'all risk' insurance. * * * The plaintiffs must prove that the loss was caused by some risk expressed in the policy" and "that the sinking of the 'MANATEE' was caused by a latent defect."

The Inchmaree clause was first used in the year 1889 by British hull underwriters in an attempt to adapt the traditional sailing ship policy to new risks introduced to the maritime shipping industry by steam power. See Tetreault, The Hull Policy: The "Inchmaree" Clause, 41 Tul L Rev 325, 325-28 (1967). In view of the profound changes which have occurred in the marine insurance, shipping, and boating industries since 1889, we should examine the traditional rules of interpretation applied to the Inchmaree clause when included in a pleasure craft "Yacht Policy."

In 1889 only commercial vessels plying the seas were covered by hull insurance. Today there are 5,539,600 licensed or documented pleasure craft in the United States, most of which are covered by marine insurance policies. Ninety-eight thousand one hundred of those are licensed or documented in Oregon pursuant to ORS 488.715 to 488.805.

Today, when the typical owner of a pleasure craft seeks marine protection and indemnity insurance (ORS 731.174(2)), his objective is financial protection from all or most of the risks which reasonably flow from ownership and operation of his craft. In this respect, he is not markedly different from the purchaser of automobile liability and property insurance. He bar-

gains with the salesman about little concerning his coverage, pays his premium, and receives a printed policy. The policy itself is seldom read, and almost never understood, because the content is complicated and filled with confusing legal terminology. Nevertheless, the boat owner believes that when the contract is executed and the premiums are paid he is "covered." He may be wholly unaware of the exact type or extent of coverage, or any qualifications or exceptions to the policy coverage about which he has not been warned. See Keeton, Insurance Law Rights at Variance With Policy Provisions, 83 Harv L Rev 961, 966-69 (1970).

These policies frequently end up in court as the subject matter of litigation. To avoid harsh results, courts often strain policy language to provide coverage. The Inchmaree clause in this case is an example of a policy provision which could lead to an unjust result were it not given a very broad interpretation.

Technically, the insured peril in this case was a latent defect in the Manatee's hull, and, under *Shaver Co. v. Eagle Star Ins. Co.*, 172 Or 91, 139 P2d 769 (1943), the insured must prove that such a defect caused the loss. The majority opinion holds that there was no direct evidence of a latent defect in the case but that circumstantial evidence created an inference of such a defect sufficiently strong to allow the jury to consider the question.

The difficulty is with the term "latent defect." In this case, the term is stretched to embrace an unknown, unexplained something that caused the Manatee to sink at its mooring. This interpretation does violence to the language but justice to the case. The phrase may have served a proper function in 1889 but today it only confuses courts and policyholders and frustrates

the reasonable expectations of the insured, a result which courts have historically disfavored. See Keeton, *supra*, 83 Harv L Rev at 967. We would reach an unreasonable result if we denied the plaintiff policyholders the coverage which they reasonably assumed they had purchased because they cannot explain an inexplainable sinking.

> "When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. * * * Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective. * * *" *Kievit v. Loyal Protect. Life Ins. Co.*, 34 NJ 475, 482-83, 170 A2d 22, 26 (1961).

In the light of changed circumstances, the Inchmaree clause should be interpreted according to the rule in *Kievit*. Accordingly, I concur in the result of the majority opinion.

MCALLISTER, J., joins in this opinion.