Argued October 30, 1950; reversed and remanded January 4;
petition for rehearing denied January 31, 1951

## BARNES *v.* DAVIDSON ET AL.

226 P. (2d) 289

*George T. Cochran* and *C. R. Eberhard,* of La Grande, argued the cause for appellants. With them on the brief were Richards, Haga & Eberle, of Boise, Idaho.

*Carl G. Helm, Jr.,* of La Grande, argued the cause for respondent. On the brief were Helm & Cavanaugh, of La Grande.

Before Lusk, Chief Justice, and Brand, Rossman, Hay, Latourette and Warner, Justices.

ROSSMAN, J.

This is an appeal by the defendants from a judgment of the Circuit Court, based upon a verdict, in favor of the plaintiff, and entered in an action wherein the plaintiff charged that the defendants so negligently operated a tanker truck owned by them that

it collided with a similar vehicle owned by the plaintiff. Both parties to this action are in the business of operating tanker trucks which transport gasoline.

The defendants present five assignments of error. The first two are predicated upon the refusal of the court to give instructions to the jury requested by the defendants; the remaining three are based upon instructions which were given to the jury.

The complaint, after charging that the defendants operated their tanker truck negligently and thereby caused it to collide with the plaintiff's, prayed for damages in the amount of $2,221.29. The answer, in addition to denying all averments of negligence, alleged that the plaintiff's tanker truck was operated negligently, that it collided with the defendants' and that it inflicted upon the latter damages to the extent of $5,890.62.

The vehicles which were involved in the collision were combination trucks and trailers. The plaintiff's was about 55 feet long. Its driver described it as seven feet, eight inches, or seven feet, nine inches, wide and the defendants' as "a little bit wider than mine." At the time of the mishap the plaintiff's tanker truck had a full load of gasoline, the defendants' was empty.

The collision occurred February 3, 1949, at 6:00 a.m., upon a bridge, 150 feet long, known as the Perry bridge, which is four miles west of La Grande on U.S. Highway 30. The width of the bridge is important. It is 17 feet, two inches, wide between curbs and 17 feet, six inches, wide between the inside of the overhead steel structure. If the plaintiff's tanker truck was seven feet nine inches wide and the defendants' seven feet ten inches wide, then if the two vehicles were

brought alongside each other upon the bridge there would be left between curbs 19 inches of unoccupied space.

At the hour of the collision, dawn had not yet come. The floor of the bridge, at least the part adjacent to the curbs, was covered with ice and packed snow. Some witnesses swore that the entire floor was covered with ice and that the yellow line which marked the center could not be seen. They testified that traffic had channeled a single lane down the center of the icy surface marked with deep ruts. Others claimed that the traffic lane in the center of the bridge was virtually free from ice and that the yellow line was visible. All agreed that ice and snow were piled against the curbs. The plaintiff's witnesses described the highway on either side of the bridge as ''slick'', but some of the defendants thought that it was icy only in spots. The defendants' driver, as we shall point out more fully later, in nearing the bridge, felt so uneasy about the icy surface that he refrained from applying his brakes. He explained, ''If I held the brakes I would start sliding, so I let loose of them.'' Very likely the quoted words afford a good index to the condition of the pavement.

As the highway approaches Perry bridge from the west (the direction from which the plaintiff's truck came) it descends slightly and curves to the right around an adjacent bluff, so that a driver coming from that direction goes downgrade and cannot obtain a view onto the bridge until he nears it. The witnesses estimated the required distance as about 250 feet. A driver who approaches the bridge from the east (from which the defendants' truck was coming) encounters a slight upgrade and a cliff to his right around which

the highway skirts. Due to that obstruction, one who approaches the bridge from the east cannot obtain a view along it until he is within 200 feet or so of it.

February 3, at 6:00 a. m., the plaintiff's tanker truck approached Perry bridge from the west. Its driver, H. G. Wright, swore that because of the slippery condition of the roadway he drove no faster than 20 or 25 miles an hour that morning, and that as he neared the bridge he reduced his speed upon meeting a truck. When he entered upon the bridge, so Mr. Wright stated, the defendants' truck came into view from the opposite direction, that is, from the east. Mr. Wright was positive that he entered upon the bridge first and that he was driving along it when the defendants' vehicle was still approaching the structure. The defendants' driver, Max Meyer, upon the other hand, testified that he entered the bridge first. According to him, he was "just a few feet" upon the bridge when the plaintiff's truck entered. Mr. Meyer claimed that his speed was about "fifteen or twenty" miles per hour as he prepared to enter the bridge. The plaintiff's witnesses attributed to the defendants' driver a speed of as much as fifty miles an hour.

The collision out of which this action arose took place upon the bridge. Mr. Wright swore that when he saw the defendants' truck enter the bridge, "I seen he couldn't stop so I anchored mine there and stopped." He stated that when he first noticed the defendants' truck he observed its speed and estimated it as "about fifty miles an hour." He explained: "I seen he was coming so fast he couldn't stop, so I got mine stopped." According to him, his vehicle was standing motionless when the defendants' "slid on into the side of me there as far as he could get." Mr. Wright's estimate of Mr.

Meyer's speed was supported by the driver of a truck which Mr. Meyer overtook shortly before the mishap. Mr. Meyer, upon the other hand, testified that the plaintiff's truck came down the roadway "astraddle of the line" at a speed of about 15 or 20 miles an hour and, "a split second" before the impact, turned to the right.

Those who saw the two disabled vehicles after the collision swore that the defendants' was against the steel framework of the bridge to its right. Marks were upon the steel for a length of 38 feet. The plaintiff's truck, according to its driver, "was just as close as I could get it" to the right side of the bridge. He added that the force of the impact "slewed" the rear slightly away from the curb.

According to Mr. Wright, if he had gone about eight feet further, the front end of his truck would have been completely off the bridge. He claimed that the rear end of his trailer was about 60 feet from the east end of the bridge. He was corroborated by others, including a witness called by the defendants. Mr. Meyer, to the contrary, testified that his vehicle had proceeded a little beyond the center of the bridge before the collision occurred.

As we have said, the right side of each vehicle, when the two came to rest, was against the corresponding side of the bridge's framework. The forward parts of the two tankers were adjacent to each other. Neither door of either truck could be opened by the drivers as they sought to extricate themselves from the disabled trucks. The right door of each was against the framework of the bridge and the left door was against a part of the other's vehicle.

A witness for the plaintiff, who was asked whether two tanker trucks could pass each other on Perry bridge, replied:

> "I don't believe they could very well that day. It was too slick; unless they cut down to five or ten miles an hour, with both of them at least; a little sway of either one and they would have hit regardless."

Another witness thought that two tanker trucks could pass on the bridge "under perfectly dry, normal conditions, where there is no snow or any other obstructions at the curbs, and provided both trucks knew they were going to pass and proceeded at two, three or four miles an hour." A witness for the defendants, who answered "yes" to a question inquiring whether it was "reasonably practicable for two trucks to meet and pass on the bridge" under the conditions that existed on the day of the accident, upon cross-examination, answered "no" to a similar question. Another witness for the defendants, who had driven trucks upon the highway with which this case is concerned for nine years, said: "I have never passed a tanker" on Perry bridge.

Evidence shows that truck drivers employ two practices or usages which are intended to promote safety. Under the first of these occupational practices, a truck approaching another indicates by blinks of a light information which its driver wishes to impart to the other. One blink, or "light," warns the approaching driver that there is need for caution; two indicate that everything is all right; and three request the approaching driver to stop. The signaled truck makes a response. The other practice, which is applicable to narrow bridges, grants the right of way to a loaded truck over an unloaded one which is approaching from the

opposite direction. This practice is particularly applicable when the loaded one is traveling downgrade. Under it, Perry bridge is deemed a narrow one. Mr. Meyer acknowledged that he was familiar with both practices. No witness criticized either usage. The testimony which we have just reviewed is uncontradicted.

All witnesses who testified upon the subject swore that tanker trucks which cross Perry bridge going east are loaded and that all traveling west are empty. The reason is that the trucks obtain their loads of gasoline at Umatilla and haul it east.

When Mr. Wright rounded the embankment to his right at the approach to Perry bridge he observed the defendants' truck approaching from the opposite direction and presently, so he claimed, blinked his signal light once. Thus, he claimed that he gave the "light" which requested the defendants' vehicle to be cautions. He did not receive back an acknowledgment. He further said that he proceeded under a belief that he would be accorded the right of way. Mr. Meyer swore that as he rounded the cliff to his right he saw the headlights of the plaintiff's truck and thereupon blinked his signal light once. He recevied no acknowledgment, according to his testimony. Thus, each driver claimed that he gave the "caution" signal.

The following is taken from Mr. Meyer's testimony:

"The road was new to me. I didn't know there was a narrow bridge right there."

He testified that he did not see the Narrow Bridge sign placed by the Highway Commission at the approach of the bridge.

We have mentioned the fact that when Mr. Meyer rounded the curve at the east approach of the bridge

he feared that if he kept his brakes applied his truck would skid. We think it best to quote his actual testimony.

"A. When I saw it [plaintiff's truck] I tried my brakes, and saw that the only thing to do was roll down and proceed with caution, so I signaled with the caution light, and didn't get any answer. I went on the bridge, right against the railing. If I had tried to stop I probably would have slid and blocked it completely. I went in the bridge all right, against the railing, scraped the steel railing for thirty-eight feet before the impact. * * *

"Q. Why didn't you keep your brakes on?

"A. Why didn't I? If I had held the brakes I would start sliding, so I let loose of them. That way you can stay in a straight line. I wanted to slow down sufficiently so that I could stay on my own side of the road.

"* * *

"Q. And as you came around the east curve and got straightened out, you felt that the only thing to do was to attempt to go on across the bridge?

"A. That is right.

"Q. You base that, as I understand it, on the fact that the road was so slick, and you thought you would be unable to stop?

"A. It is possible I could have stopped, but to do so under those conditions, I would probably have gone in the ditch, or crossways to the road, or up against the bridge.

"* * *

"Q. The condition of the road, I take it from your testimony, was more or less, patchy, so far as the ice is concerned?

"A. Yes.

"Q. It wasn't covered with packed snow and ice?

"A. No, not completely; most of the center of the road was bare.

"Q. Was it bare on the approaches to the bridge?

"A. I really don't know.

"Q. Assuming that it was in the same condition as the balance of the highway, you should have been able to stop, shouldn't you?

"A. Not to make a sudden stop.

"Q. Well, as I understand it, it was bare.

"A. It was icy too, spotted.

"Q. Did you make any attempt to stop at all?
"A. Yes.

"* * *

"Q. You mentioned attempting to stop prior to going on the bridge. What did you do at that time?

"A. I got about stopped; and I was afraid to try for a sudden stop, so I just got slowed down, let loose the brakes, and went on the bridge straight.

"Q. You did, you say, use your brakes?

"A. Before I got on to the bridge.

"Q. For what distance?

"A. Oh, probably halfway from—I imagine fifty or sixty feet.

"Q. State whether or not that was causing you to skid.

"A. I was afraid it would.

At that point a question brought some colloquy between counsel, followed shortly by this answer given by Mr. Meyer:

"A. Well, to apply your brakes suddenly on an icy road, as any driver knows, is to say I prob-

ably would have skidded around. In a case like that you shouldn't dare start sliding because you might go right into the bridge.

"Q. Or into the abutments of the bridge?

"A. Yes."

The foregoing is all that Mr. Meyer said about the use of his brakes and attempts to slow down his vehicle.

We add that the unchallenged testimony indicates that as Mr. Meyer approached the bridge he was ascending a slight upgrade. The plaintiff's truck, as it neared the bridge, was coming down a slight descent.

For the purposes of a consideration of the assignments of error, the foregoing will suffice as a statement of the facts. It is seen from the above that, although the thousands of miles of broad pavement which constitute Highway No. 30 were available to the two vehicles, each was destined to meet its Nemesis in the form of the other truck upon this bridge which was so narrow that the Highway Commission had placed at each end a sign reading "Narrow Bridge."

■■ The first assignment of error complains because the jury was not instructed as follows:

" * * * therefore, if you find that the plaintiff drove on the said bridge on his left hand side of the highway, or partially on his left hand side of the highway, that would constitute negligence."

Those words were not limited to the part of the bridge where the collision occurred. Since Mr. Wright freely acknowledged that he was partially over the yellow line when he entered upon the bridge, the requested instruction, had it been given, would have condemned his driving at that place as negligent. Mr. Wright claimed, as we have already indicated, that when he

entered the bridge the defendants' truck was a considerable distance away from the other end, and that packed ice and snow lay next to the curbs. If his testimony reflected the truth, the frozen, slippery material virtually forced drivers to use the center of the roadway. He swore that when he observed the defendants' truck enter the bridge he turned to the right against the curb and stopped. Although § 115-329, O. C. L. A., says that "drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other at least one-half of the main traveled portion of the roadway as nearly as possible," a failure to keep to the right when there is nothing to the left which will be affected by the car's presence there does not condemn the driver as negligent: *Weinstein v. Wheeler,* 135 Or. 518, 295 P. 196, 296 P. 1079. We think that no error was committed when the requested instruction was not given.

 The second assignment of error is based upon a charge that the trial judge should have instructed the jury as follows:

"I further instruct you that the defendant has a right at the time he approached and entered upon the bridge where the accident in question occurred, to assume that the plaintiff would obey the law and yield to him the right of way and would control his truck so as to avoid a collision. The defendant was authorized to assume that the plaintiff would enter upon said bridge with ordinary care and would observe the rules of the road and operate his truck under control and at a rate of speed that was safe for all users of the highway in question, and the defendant had a right to act on this assumption until he, as a reasonable man under the circumstances, discovered that the assumption was erroneous and if you find from the evidence that

the driver of the defendants' truck did discover that such assumption was erroneous, then it was his duty to act and do the things which an ordinarily prudent man would have done under the circumstances, and if you find that the driver of defendants' truck did so act as an ordinarily prudent man, then he would be without negligence in the situation and your verdict must be for the defendant.''

In behalf of the requested instruction, the defendants claim that it states the law governing action taken in an emergency. Instructions which were given fully delineated to the jury the rules which exact of all drivers due care and compliance with all traffic regulations. They must have made the jury realize that, although the demand for due care is omnipresent, its exaction of the individual is dependent upon the difficulties which faced him when he was required to act. Thus, the instructions were applicable, not only to conduct pursued under normal conditions, but also to emergency action. Generally, appellate practice entrusts to the judge who presides over the trial the question of determining whether a charge applicable to all conditions should be supplemented by an instruction specifically applicable to some suggested phase of the situation: *Kiddle v. Schnitzer*, 167 Or. 316, 114 P. 2d 109, 117 P. 2d 983. We think that the instructions acquainted the jury with the legal principles applicable to emergency action and are aware of no reason for believing that the trial judge abused the discretionary power just mentioned. This assignment of error discloses no error.

The third assignment of error is based, in part, upon the following instruction which was given to the jury:

''I further instruct you that while a driver may assume that a vehicle approaching on the wrong

side of the road will turn to its own right side in time to avoid danger, however he is not entitled to rely on that assumption after he sees, or by the exercise of reasonable care should see, that it is unwarranted, and that the approaching vehicle will not change its course or that the driver thereof is unable to avoid the danger; and under such circumstances it become the duty of the driver of the vehicle who is on the right side of the highway to use reasonable care to avoid any impending collision by turning further to the right, or slowing up, or even stopping * * *."

That instruction was drafted by the defendants' counsel and given in the exact words penned by him. However, his drafted instruction added after the words "or even stopping" the following:

"and if such driver fails to perform such duty, he is guilty of contributory negligence, and if you find from the testimony herein that the plaintiff, within a reasonable stopping distance and by the exercise of reasonable care, should have seen that the defendants' truck would not change its course or that the driver thereof was unable to avoid the danger, and the plaintiff failed to use reasonable care to avoid the impending collision by turning further to the right or slowing up or stopping, then the plaintiff is guilty of contributory negligence and your verdict should be for the defendant."

This assignment of error is predicated partially upon the refusal of the trial judge to give the jury those requested rules. What we have said in part concerning the preceding assignment of error is applicable likewise to the words of the requested instruction which were rejected. An instruction given told the jury:

"On the other hand, you are instructed that if you believe from a preponderance of the evidence that the driver of plaintiff's truck saw—or by the

exercise of reasonable diligence could have seen— the defendants' truck at a time when he was a sufficient distance away from the defendants' truck to have decreased his speed or stopped, and thereby have avoided the collision, then, under those circumstances, you are instructed that it was the duty of the driver of plaintiff's truck to have his truck under such control that he could stop or decrease his speed in order to avoid a collision, if an ordinarily prudent person under such circumstances would have so done.''

Since the defendants' truck was as far to the right as it could get when it entered the bridge, the words ·''by turning further to the right,'' so far as they were applicable to it, should have been omitted. However, the defendants wrote the words as a part of their requested instruction and, therefore, are not in a position to criticize their use. We think that the instruction as given was as favorable to the defendants as they were entitled to have. We find no merit in this assignment of error.

■ The fourth assignment of error is based, in part, upon an instruction given to the jury which said:

''You are instructed that when meeting and passing vehicles it is the duty of drivers to drive on the right half of the road. The plaintiff claims that the defendants' truck was driven with its left wheels to the center * * * . On the other hand the defendants claim that plaintiff's truck and trailer was operated with its wheels to the left of the center * * * .''

Going on, the instruction charged the jury with the duty of determining the facts in regard to the respective claims and then gave them the applicable principle

of law. In support of their claim of error, the defendants argue:

> "By this instruction the allegations of the defendants' answer that the plaintiff failed to reduce his speed, and failed to keep on the right and southerly side of the highway, and failed to use ordinary care in the situation, and failed * * * are entirely taken away from the jury."

A segment of the instruction declared: "Now, here are the charges of negligence which the defendants place against the driver of plaintiff's truck" and then, continuing, read to the jury all of the specifications of negligence which are set forth in the answer. We believe that every one of the defendants' charges against the plaintiff's driver was stated to the jury. We dismiss this assignment of error as lacking in merit.

The fifth assignment of error is based upon (1) a comprehensive instruction which was given to the jury about "certain customs and/or usages of drivers in the trucking industry in this area," and (2) three instructions requested by the defendants upon the same subject which were rejected. The "customs and/or usages" were the ones to which we have referred as practices, or usages. We took the quoted words from the instructions themselves.

There is no harm in terming trade, industrial, occupational or neighborhood practices and usages as customs, provided one does not thereby confuse that term with the ancient customs which eventually emerged into and became law. Those ancient ones were venerable with age, they represented the mores of the people, and were universally acknowledged. They, like law itself, were enforceable and not the mere sub-

ject of voluntary compliance. Although the ancient customs were law, our modern usages, as § 2-228, subd. 12, O. C. L. A., indicates, perform their principal courtroom service in explaining "the true character of an act, contract, or instrument." *Silver Falls Timber Co. v. Eastern & Western Lumber Co.,* 149 Or. 126, 40 P. 2d 703, develops the distinction which we have in mind.

The attacked instruction, in a part which the defendants do not criticize, told the jury:

"The existence of a custom or usage will not justify the violation of a statutory duty. The customs and usages pled, however, are to be considered by you, if proven by a preponderance of the evidence, in determining whether defendants' driver used the care of an ordinary, prudent person under similar circumstances."

A companion instruction stated:

"You are instructed that before you can find the existence of the alleged custom or customs, you must believe from a preponderance of the evidence that such custom or customs were reasonable, * * * ."

The following are the parts of the instruction which the defendants challenge:

"If you should find by a preponderance of the evidence that there was a custom and usage among the drivers of commercial transport trucks, or trucks traveling light and going upgrade to yield the right of way on bridges, * * * to commercial transport trucks traveling loaded and going downgrade, * * * ; and if you further find from a preponderance of the evidence that the plaintiff's truck was a commercial transport truck, traveling loaded and going downgrade, and that the defendants' truck was a commercial transport, traveling

light and going upgrade, and that defendants' truck failed to yield right of way to plaintiff's truck and allow it to proceed acriss the bridge here in question before proceeding on to such bridge, then I instruct you that defendants' driver was negligent, * * * if you find from a preponderance of the evidence, under the principles hereinbefore explained to you, there was a custom and usage for drivers of commercial transport trucks to signal each other by means of a spotlight or horse light, and for recipients of such signal to act thereon, and if you further find that plaintiff's driver signalled defendants' driver in accordance with such custom, thereby advising defendants' driver to use caution in proceeding, and that defendants' driver failed to act on said signal, then defendants' driver was guilty of negligence, * * * ."

■ The part of the instruction which the defendants do not criticize submitted the usage or occupational practice to the jury as fact-material which it could use in interpreting the nature of Mr. Meyer's driving; that is, in determining whether or not he, as a truck driver, met the demands of due care. Upon the other hand, the criticized parts of the instruction gave the usage the status of law and rendered a violation of it negligence. The defendants' exception to the part of the instruction just mentioned is the following:

"Such instruction is to the effect that the violation of a custom is negligence, and such is not the law. The violation of a custom can at no time be classed as negligence as a matter of law."

We take the following from the defendants' brief: "It is a custom among commercial transport drivers to signal each other as follows:" Thereupon the code

of signals which we have delineated is set forth. Going on, the defendants' brief says:

"There is some testimony (B.E. 60) that it was the custom that the loaded tanker should have the right of way. This custom applies only to narrow bridges and one-way traffic."

As we have said, the evidence pertaining to both "customs" is uncontradicted, and defendants' driver acknowledged that he was familiar with both; in fact, he swore that he gave the caution signal himself.

The usages were evidence relevant to the issue as to whether or not the defendants' driver employed due care, but they did not necessarily define and establish the demands of due care: *Silver Falls Timber Co. v. Eastern & Western Lumber Co.*, supra; *Hise v. City of North Bend*, 138 Or. 150, 6 P. 2d 30. In addition to the authorities cited in those decisions, see, also, 65 C.J.S., Negligence, p. 404, § 16; 38 Am. Jur., Negligence, p. 679, § 34; *Eich v. Brennan*, 223 Wis. 174, 270 N. W. 47; *Langner v. Caviness*, 238 Iowa 774, 28 N. W. 2d 421, 172 A. L. R. 1135; and annotation 172 A. L. R. 1141. The two decisions last cited dealt with truck operations and occupational practices substantially similar to those which are present in the case at bar. The trial judge properly gave to the jury the part of the instruction above quoted, which said:

"The customs and usages * * * are to be considered by you * * * in determining whether defendants' driver used the care of an ordinary, prudent person under similar circumstances."

From the foregoing, it follows that the instruction erred when it stated that a violation of the usages constituted negligence. A custom may exact more than

the demands of due care, or it may exact less. It is only when its exactions are the same as those of due care that a violation of it is tantamount to negligence. The witnesses who described the right-of-way practice gave such an inadequate description of it that it is impossible to determine with certainty whether or not the practice was applicable to a driver, such as the defendants', who did not know that the nearby bridge could not accommodate both vehicles. In view of that fact at least, no court can say that the practice and due care were counterparts of each other.

■ It is evident that this is an instance of inconsistent instructions. The unchallenged part of the instruction was correct, the other erroneous. Generally, inconsistent instructions require reversal: *Fehely v. Senders,* 170 Or. 457, 135 P. 2d 283, 145 A. L. R. 1092; *Haltom v. Fellows,* 157 Or. 514, 73 P. 2d 680. The question now occurs whether the error we have mentioned requires reversal.

■ In *Nickum v. Gaston,* 24 Or. 380, 35 P. 31, Mr. Justice ROBERT S. BEAN quoted with approval as follows from *DuBois v. Perkins,* 21 Or. 190, 27 P. 1044:

> " ' * * * While it is true that error will never be presumed, the converse of the proposition is equally true. When error does affirmatively appear, it will not be presumed that it was rendered harmless, or removed.' "

See, also, *DeLashmitt v. Journal Publishing Co.,* 166 Or. 650, 114 P. 2d 1018, 135 A. L. R. 1175. In the present instance, the part of the instruction, free from error, was abstract; the other part was couched in terms which fitted it to this case. The significance of the former may have escaped attention; the import of the latter was self-evident.

The plaintiff's brief contains no argument that the error of which we have just taken notice was non-prejudicial and none that the error was rendered harmless. We sustain the fifth assignment of error.

The attacked judgment is reversed and the cause is remanded.