Argued November 18, reversed November 26, 1952

# ADKINS *v.* BARRETT ET AL.

250 P. 2d 387

*William R. Thomas* argued the cause for appellant. On the brief were Morley & Thomas, of Lebanon.

*Orval N. Thompson* argued the cause for respondents. On the brief were Weatherford & Thompson, of Albany.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is an action brought by Francis O. Adkins, as plaintiff, against Raymond J. Barrett, John J. Barrett, and E. L. Barrett, dba Barrett Brothers, as defendants, to recover damages for injuries to and loss of use of a logging truck and trailer, alleged to have been caused by defendants' negligence. The case was tried to a jury. A verdict was returned in favor of defendants, and judgment was accordingly entered. Plaintiff appeals.

Defendants conduct a motor truck establishment at Albany, in Linn county, Oregon. They sell and rent motor trucks, including logging trucks and trailers. They also conduct a general motor truck repair business and sell parts.

Plaintiff is engaged in the logging business in the Coast range of mountains, in Polk county, Oregon. Logs are hauled from the logging site by motor trucks and trailers. The road leading from the logging site to the public highway is narrow and crooked and has steep grades.

One of the motor trucks used by plaintiff in transporting logs is an M5 International, which he purchased from defendants. Originally this vehicle was a 2½-ton military truck. Before its purchase by plaintiff,

the truck had been converted into a logging truck. The original front axle assembly on this truck was one manufactured for that type of vehicle by Eaton, and was in every way suitable for all military purposes.

On or about July 15, 1948, the front axle on this motor truck broke. On July 16, 1948, the truck, at the request of plaintiff, was towed by defendants to their garage in Albany for the purpose of installing a new front axle assembly. It was decided to replace the original type of axle, referred to as a G.I. axle, with a conventional type.

Defendants procured and placed upon said truck a used front axle assembly of the conventional kind, manufactured by Timken. The spindle on this axle assembly was a three-fourths-inch spindle, with a corresponding three-fourths-inch nut.

On July 19, 1948, this motor truck and trailer fully loaded with logs was being driven along the road abovementioned. This was its first trip with logs after the repairs had been completed. A short distance from the logging site, and after it had proceeded around a sharp curve in the road and down a steep grade, the truck's left front wheel came off, causing the loaded truck and trailer to be thrown off the road and down a steep bank, wrecking the equipment. Examination of the spindle and nut after the accident disclosed that the threads thereof had sheared off completely.

Plaintiff brought action against defendants for the damages sustained, charging defendants with negligence in making the repairs as described. Plaintiff alleged: "that the spindle placed on the said axle was a three-fourths inch spindle whereas that said truck required for its normal duties and safe operation a spindle of one and one-fourth inches or greater."

Upon the trial, as an important part of their defense, defendants produced evidence to the effect that in the repairs they made, they followed an established and common practice as to the size and type of axle, spindle, and nut used by them. Their contention in that respect is well illustrated by the testimony of Edward L. (Bob) Barrett, who testified as follows on direct examination:

"Q   Is it common practice in garages here in Albany, in Linn County, Oregon, repairing this type of truck to install used parts such as a used axle, and other members that break?

"A   Very common.

"Q   Had Barrett Bros repaired other trucks for Adkins?

"A   Yes.

"Q   And on those other repairs had used parts been used from time to time?

"A   I couldn't answer that. I can imagine that there was a time when we probably used some used parts.

"Q   Was that the common practice, too, to use used parts?

"A   Not in ordinary repair, no. Let's distinguish between a part and a unit. The unit is made up of many parts. If you were going to work on an individual part of a unit, then the feasibility of using a used part would definitely be subject to lots of scrutiny.

"Q   Is it your practice when you install individual parts to install new parts, but when you install units you sometimes install used units, such as a front axle assembly?

"A   That is very common.

"Q   Was Mr. Adkins aware of that practice?

"A   Well, I couldn't answer as to his awareness.

"Q How did you happen to secure this particular axle that was installed in the truck?

"A I was looking for an axle that used the same wheel assembly or wheels that were part of the assembly that were already under the truck, or part of the truck, and specified an axle that would carry the same kind of wheels for that particular purpose.

"Q What kind of wheels were those?
"A Six-hole bud wheels.

"Q The bud is the name of a manufacturer?
"A Yes, Budd is the manufacturer that holds the patent on it.

"Q Is that the type of wheel commonly in use on logging trucks of this type?
"A Yes, there are many of them in use.

"Q Are they commonly in use in this part of the State of Oregon?
"A Yes.

"Q Where did you buy this axle?
"A From Oregon Parts in Portland.

"Q Did it come to you as a complete unit?
"A Yes, it did.

"Q What does that consist of, just briefly.
"A It consists of an axle eye beam upon which were assembled the spindles, backing plates, hubs, drums, all brake assembly, and what is known as a tie-rod which connects the spindles on either side of the axle so that they turn from one central point.

"* * * * *

"Q Did you see the axle after it arrived?
"A Yes, I did.

"Q What was its general condition?
"A It looked good.

"Q Was this the type of axle often installed in logging trucks that had the same front axle capacity as this logging truck?
"A Yes.

"Q Did this axle have any apparent defects?
"A No.

"* * * * *

"Q Would you describe a G.I. axle to the jury, such as the one that was in this M5.

"A A G.I. front axle is first of all an axle that will propel a truck in conjunction with the two rear axles, or in some cases, one rear axle. The military trucks are known as 4 x 4 or 6 x 6. If all four corners of two axles drive, that is a 4 x 4; if all six corners of a dual axle and a front axle drive, that is known as a 6 x 6. The thing that makes an axle drive is a differential assembly, and this front axle has this gear set with a differential assembly in a tubular housing. Now, in order to make that front axle guide, the outer parts, each outer end, have to be separated from the main central stationary part so that they can turn from the effort of the wheel. They are installed to this main part with a ball and socket arrangement that allows the outer end to oscillate according to the effort that is applied to the steering wheel. The tublar part is carried completely through. The main part of the axle is tubular. The banjos in the middle and the two extremities, that are the spindles, are also tubular and attached through this ball and socket arrangement.

"Q Where was this G.I. axle on the M5 broken? Do you recall the point?

"A Yes, it was broken, as I recall, in the main body, just at the edge of the spring seat.

"* * * * *

"Q In 1948 was it a common practice to use trucks with six hole bud wheels in the logging industry to haul logs?

"A Yes, it definitely was.

"Q Did they use in 1948 and prior, any truck with 10 hole bud wheels?

"A 1948 and prior?

"Q Yes.

"A Yes, there were some used with ten-hole bud wheels prior to 1948.

"Q Is there any one type or what other type of truck do you recall that used six hole bud wheels in 1948, and prior?

"A As a general overall category, all trucks in a 3 to 4-ton rating used six hole wheels. In a single drive unit and in dual drive units, I would stretch that up to 5 or 6 tons. The industry has quit using tonnages in designated models; particularly in the six-wheel trucks, and it is kind of hard to make an application of tonnages when they are now set on a standard or gross vehicle weight.

"* * * * * *

"Q Did this M5, this military vehicle have a rating by tons?

"A Yes, it did.

"Q What was its rating?

"A The Government had rating on all of their vehicles, tonnage size; this was rated as a 2½ ton truck.

"Q Would that fall in the type of trucks that usually use a six-hole bud wheel?

"A Yes, it did.

"* * * * * *

"Q Is there a great amount of pressure on a nut on the end of a spindle on a truck of this kind?

"A Yes, there is a definite pressure on it. The bearing is a pretty snug fit on the spindle, and the nut is used to make sure that the bearing doesn't slide off. The amount of tolerance between the size of the spindle—the outside diameter of the spindle where the bearing fits it—and the inside diameter of a bearing is measured in terms of two one hundred thousandths of an inch. It can be pushed on with finger effort or hand effort, but it takes quite a little bit of it. It is the friction between the inner bearing. That race doesn't turn; that

slides onto the spindle. The roller turns over that race. That stays in a stationary position so the seizure of that to the machine surface of the spindle is the thing that takes the bulk of the pressure.

"Q What was the name of the axle that was installed on the Adkins truck?
"A I think it was a Templeton axle.

"Q And is that a standard make of axle?
"A Yes, it is.

"Q Is that one that is often used in vehicles of this type?
"A Yes, quite a number of manufacturers use Templeton axle, front and rear.

"Q Was the size of this particular axle of the same size as is commonly used in front axles that carry comparable load weights?
"A Yes, according to the Oregon highway formula, it is."

On cross-examination, the witness further testified:

"Q We have been doing a lot of double talking. Who selected the bearings on the first job?
"A The Timken Axle Co.

"Q You didn't do it?
"A We didn't have anything to do with it.

"Q Does the Timken Axle Co. put out this size axle?
"A Yes, they do.

"Q With this bearing capacity?
"A Yes, they do.

"Q Didn't you order an axle for this truck?
"A I ordered an axle for this truck.

"Q And you didn't determine as to which size spindle it should have?
"A No.

"Q  If the spindle was too small, it was the Timken people's fault, is that correct?

"A  May I hear your question again?

"Q  If this spindle was too small, it was the Timken people who made the error, is that correct?

"A  Yes, sir, if the spindle was too small.

"Q  But you could have ordered a different one, couldn't you?

"A  I am not so sure.

"Q  Do you know what size one you put on it at that time?

"A  I ordered a front axle that would carry six hole wheels that would go underneath a six wheel truck.

"Q  Isn't there different size axles that will hold a six-hole bud wheel?

"A  Not very many this size that hold a six-hole wheel, no.

"Q  But there are different ones, aren't there?

"A  Probably.

"Q  You just ordered a six-hole bud wheel axle for a six-wheel truck?

"A  That is correct."

■■ Plaintiff assigns as error on this appeal the giving of the following instruction to the jury:

"When the owner of a motor vehicle requests a repairman to make repairs thereto, the repairman fulfills his legal obligations to the owner if he makes the repairs requested in a workmanlike manner and with materials which are not defective. In this case, if you find from a preponderance of the evidence that the plaintiff requested the defendants to install a front axle in his truck and that the defendants installed an axle as requested by the plaintiff in a good, workmanlike manner, *and that the axle so installed was the type and size of axle commonly used upon trucks of the size and type of plaintiff's truck, and that such axle was not defec-*

*tive, then the defendants would not be liable."*
(Italics ours.)

To the giving of this instruction, plaintiff duly
excepted as follows:

"The plaintiff excepts to the giving of de-
fendants' requested instruction No. 2 for the reason
that it in effect instructs the jury that the plaintiff
cannot recover if the axle in this case was the
type and size commonly used upon a truck of the
size and type as plaintiff's truck. That is in sub-
stance. Plaintiff excepts for the reason that it is
the position of the plaintiff that common usage in
a matter of this kind is not a test of reasonable
care and is no evidence that due care was used in
the size and type of axle which was used in this
case."

The effect of the instruction as given was to tell the
jury that if defendants followed a common practice
or usage as to the type and size of axle installed by
them, they exercised due care as a matter of law.

Evidence that one charged with negligence followed
a common practice or usage is admissible for con-
sideration by the jury in determining whether, under all
the facts and circumstances of the case, he exercised
due care. In other words, it is evidence of due care,
but is not conclusive as a matter of law that due care
was in fact exercised. This is the law not only in this
jurisdiction, but in practically every other jurisdiction.
This court has repeatedly subscribed to that principle.
*Robertson v. Coca Cola Bottling Co.,* _____ Or _____, 247
P2d 217, 223; *Barnes v. Davidson et al.,* 190 Or 508,
527, 226 P2d 289; *Shaver Co. v. Eagle Star Ins. Co.,*
172 Or 91, 109, 139 P2d 769; *Silver Falls Co. v. E. & W.
Lbr. Co.,* 149 Or 126, 174, 40 P2d 703; *Hise v. City of
North Bend,* 138 Or 150, 164, 6 P2d 30; *Myrtle Point
T. Co. v. Port of Coquille River,* 86 Or 311, 318, 168

P 625; *Richardson v. Klamath S. S. Co.*, 62 Or 490, 498, 126 P 24.

This rule is fully discussed in two exhaustive notes to be found in ALR: 137 ALR 611; 68 ALR 1400. Also see 38 Am Jur, Negligence, 679, § 34.

The court erred in giving the quoted instruction to the jury. Inasmuch as this instruction was addressed to one of the principal contentions of the defendants, it is obvious that it was prejudicial and its giving constitutes reversible error.

■ We note two other assignments of error very briefly, as the same questions might arise upon another trial. Plaintiff excepted to the court instructing the jury respecting defective brakes upon the motor truck as a part of defendants' affirmative defense of contributory negligence. The giving of this instruction constituted error because there was no substantial evidence in the record to warrant the submission of that specification of contributory negligence to the jury. This also is true respecting an instruction given by the court to the jury on the matter of speed of the motor truck, to which instruction plaintiff also excepted. Neither defective brakes nor speed had anything to do with the proximate cause of the accident.

Judgment reversed.