Argued October 26, 1954, reversed and remanded March 16, petition for rehearing denied April 27, 1955

## SAVAGE, Administratrix *v.* PALMER et al.

280 P. 2d 982

*Robert L. Myers,* of Portland, argued the cause for appellant.

*John F. Kilkenny,* of Pendleton, argued the cause for respondents.

Before LATOURETTE, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

BRAND, J.

William E. Savage was killed in an automobile collision on 7 November 1951. The plaintiff brought this action as administratrix of his estate. The cause was tried by a jury. Verdict and judgment were for the defendants, and plaintiff appeals. For an understanding of the plaintiff's four assignments of error it is necessary to set forth the facts in some detail.

U. S. Highway No. 30 runs in a general easterly and westerly direction through Morrow County, Oregon. Tracing its course from Arlington, Highway No. 30, prior to a partial relocation, ran easterly through Boardman and continued on to a point where it forked. From that point Highway 730 ran northeasterly to Umatilla, and Highway 30 ran a little south of east toward Pendleton. During the months preceding the collision, the State Highway Commission constructed a "new U.S. 30" which by-passed Boardman, passing a little to the south of that city. New U.S. 30 intersected the old highway which ran through Boardman at a point about three-fourths of a mile east of that city.

We present at this point a sketch which indicates in a general way the physical objects described by the witnesses at and near the intersection of the old road and new U.S. 30. As appears in the sketch, the Highway Commission constructed a "connecting road" which ran on a curve to the south from the old road to new U.S. 30, the obvious purpose being to route eastbound traffic from Boardman through the connecting road and thence onto new U.S. 30.

As of the time of the collision, a car from Boardman proceeding east on the old road toward the turn-off onto the connecting road, would pass the following signs in the order specified, all of which faced west: (1) A "Slow" sign, (2) a sign with an arrow indicating a right-hand curve, and (3) a "Prepare to Stop" sign. An eastbound car passing these signs and turning into the connecting road would find a "Stop" sign located on its right, just before entering new U.S. Highway No. 30. The stop sign was "Scotchlighted." The sign with the arrow, indicating the right turn, was an "old type" and the "Prepare to Stop" sign was old-style with a little round reflector button. Scotchlight signs were described as signs which have a metal on the face of the board which reflects light through the paint so that an approaching car can see the sign. There was a yellow line in the center of the old road, which curved to the right, forming, as it curved, the left-hand edge of the connecting road. Immediately east of the easterly line of the connecting road, and across the right half of the old road, the Commission had placed painted yellow stripes. South of the yellow stripes and immediately south of the south line of the old road and just east of the northeast line of the connecting road, there was a Scotchlighted sign facing west, and reading, "One Way—Do Not Enter". On the old road, easterly from the connecting road, the

## APPENDIX

center yellow line indicated on the sketch by dots, had been obliterated, prior to the collision.

As of the time of the collision, a car traveling west from Pendleton would find a yellow center line as it approached the junction of the old road and the new U.S. No. 30. That center line continued westerly parallel with the south line of new U.S. 30. West of the junction of the south line of the old road with the north line of the new U.S. 30, there was a highway direction sign facing east and indicating which road to take to a desired destination. Without commenting at this time on the adequacy of the signs, it is apparent that the general plan of the Highway Commission was to route eastbound traffic from Boardman into the connecting road and thence, after a safety stop, to route it onto new U.S. 30. Eastbound traffic was to be excluded from the old road east of the connecting road so that westbound traffic for Boardman would have a one-way road from the inverted V as far as the connecting road, and there was to be two-way traffic on new U.S. 30.

For a long time prior to the late afternoon of 7 November, the day of the collision, both east and west traffic had used the old road to and from Pendleton and Boardman. The Highway Commission had constructed the connecting road and the traffic signs to which we have referred, in anticipation of the opening of the connecting road and new U.S. 30, but the signs had been covered. On the afternoon of 7 November the signs were unmasked and the connecting road was opened for eastbound traffic. The collision occurred between 7 and 7:30 on the evening of the 7th.

The defendant William D. Palmer was the son of the defendant Art Palmer and was driving his father's car, a Mercury sedan, with his father's consent. He was accompanied by three of his high school friends,

and left Boardman, driving east on the old road, bound for a movie in Umatilla. They left Boardman at about 7 p.m. They passed the "Slow" sign, the "Curve" sign, and the "Prepare to Stop" sign, and instead of turning right into the connecting road, they continued on the old road past the "One Way—Do Not Enter" sign, and on beyond the point at which the south line of the old road met the north line of the new U.S. 30. Each of the boys had made almost daily trips on this road. They all testified that they saw no signs. The driver Palmer stated that he did not know of the existence of the connecting road.

While the defendant Palmer was driving east on the old road, the deceased, Dr. Savage, was riding in his own car, a DeSoto, which was being driven by Mr. Sheckler. Sheckler was unaware that new Highway 30 was opened and was intending to drive through Boardman on the old road as he had done previously. The cars collided approximately head-on at a point east of the point of the inverted V, made by the meeting of the south line of the old road with the north line of new U.S. 30. Police officer Lucich measured the distance from the highway direction sign, which faced east and which was located near the point of the V between the two roads, to the place where defendant's car was found immediately after the accident. The distance from the highway direction sign was 371 feet, indicating that the collision ocurred approximately that distance east of the highway direction sign. The wrecked cars stood about five feet apart immediately after the accident.

## THE ASSIGNMENTS OF ERROR

Plaintiff assigns as error "The conduct of counsel for defendants in repeatedly seeking to introduce evidence of acts of the Highway Commission occurring

subsequent to the accident, after the ruling of the Court that such evidence would be excluded * * *."" This conduct, it is asserted, prevented the plaintiff from having a fair trial.

The second assignment is so similar to the first that we may consider them together. The plaintiff asserts that the court erred in permitting the defendant to show by testimony that the eastbound highway traffic during the night of the 7th went straight through on the old highway instead of turning onto the connecting road. Thus the first two assignments raise the same general question as to the admissibility of evidence concerning events which transpired after the collision; in the one case, the alleged changing of the signs, and in the other, the conduct of the driving public with reference to the signs as they were on the night of the collision and before any changes were made.

Defendants contend that their offers of proof were for the purpose of showing that the signs which were originally erected were insufficient to guide the traveling public and that they had to be changed by the commission.

This is a conventional automobile collision case, though the facts are unusual. The issues to be determined were those of negligence and contributory negligence under the conditions existing at the time. The Highway Commission was not a party to the controversy.

If we are to determine the admissibility of the evidence, or if it was admissible, whether the errors were prejudicial, we must review the testimony in the chronological order of its reception. Officer Lucich was called as a witness for plaintiff. We quote from his cross-examination:

"Q Now, shortly after this accident occurred

why certain changes were made at this intersection, weren't they?

"A Directional signs?

"Q Yes?

"A At the present time there is an extreme amount of difference, yes.

"Q Well, they were two or three changes made before they finally arrived at this set up they have down there now?

"A I believe some of the signs have been changed, yes.

"Q And there were other serious accidents there after this one occurred?

"A There have been accidents there, but the seriousness of them I don't know, I never investigated any of them. I couldn't testify on that.

"Q You didn't make the investigation yourself, officer?

"A No.

"Q Well, within a month or six weeks after this accident happened the Highway Commission started changing that whole plan down there?

"A It is changed, the time element I don't know."

Plaintiff made no objection to the foregoing testimony and no motion to strike.

Witness Potts, an employee of the Highway Department, testified upon direct examination by defendant, that yellow paint marks on the old highway at the point where the connecting road turns to the right were put on before the highway was opened. We quote:

"Q Now, sometime after that did a machine put on some marks—were some other marks put on?

"A That's right.

"Q That was after the accident?

"A That's right.

"Q I hand you a photograph here which is Plaintiff's Exhibit 6, and ask you if you identify the subject of the photograph? (pause) Do you recognize what it is, Mr. Potts?

"A Yes sir.

"Q Now, those yellow lines that are on there, those cross lines, are those the ones that were there prior to the accident?

"A There are a few more there now than there was at the accident."

Counsel for defendant then interrogated the witness as follows:

"Q Tell the jury what you went out there for?

"A They had me set out there the rest of the night to just see if I could find out what was causing them to go on through—

"Q What was causing them to go—

"A instead of turning where they should.

"Q Now, what was the facts as to people actually going on through—

"A Well, I stayed there that night and about eight out ten, I would say, went straight on through instead of turning where they should.

"Q About eight out of ten, in other words they passed this 'one-way, do not enter' sign?

"A That's right.

"Q How long did you stay there?

"A I stayed from ten until eight the next morning.

"Q And that was the fact during all of that time?

"A That's right."

The defense then asked the following question: "Now, what is the fact as to early in the morning, if you took some other position there to actually direct traffic?" The plaintiff then for the first time made objection as follows:

"MR. SAYRE: I'm going to object, if the Court please, as to this line of testimony as to things oc-

curring afterwards. I don't want to be unreasonable, but the after occurring events are no evidence of negligence or lack of negligence at the time of the accident, and I think if they want to project into the future we will object to all questions on what occurs on the highway afterwards. In other words, we are not here to try the State Highway Commission and action of the State Highway Commission are incompetent, and irrelevent, and we will object, and we object to this question.

"THE COURT: The objection will be sustained."

At request of counsel for defendant the court retired to chambers to hear argument. We may surmise, but are not advised, as to what took place there. The jury then reconvened and counsel for defendant asked the witness, "was there a change made in some of the signs which had been previously erected between Boardman and the point of the accident?" Objection was made on the ground of irrelevancy of matters occurring after the accident. At this point counsel for the parties and the witness approached the bench and out of the hearing of the jury the question was repeated as an offer of proof. The witness answered that a sign had been erected after the collision. The objection to the offer was sustained. Immediately thereafter the defense asked the witness concerning the visibility of the signs when approaching cars were driving with dimmed lights. We quote:

"Q (Mr. Kilkenny to Mr. Potts) * * * with reference to this one-way do not enter sign, now what is the fact as to whether that sign would show up after night after your lights were dimmed?

* * * * *

"Q Well, did it show up clearly with a dim light?

"A Well, that's something I didn't pay no attention to at the accident time.

> "Q Well, you have tried it since then?
> "A Yes, but they have changed it since then.
>
> "Q It's the same sign, is it not?
> "A That's right.
>
> "Q The same height from the highway?
> "A As far as I know, yes.
>
> "Q And it doesn't show up now even with the dim lights?
> "A No."

No objection or motion to strike was made. On cross-examination counsel for plaintiff again brought out the fact that there had been additional cross-patching yellow lines added after the collision.

Witness Macomber, an employee of the Highway Department, was called by the defense. He was asked whether on the evening of the 7th the highway traffic had gone straight through on the old road without making the right turn. Counsel objected. At this time the court reversed its previous ruling and held that the witness might answer. However, the witness Macomber testified, in substance, that he could not answer the question. Defense counsel then reverted to the matter of the signs. Again we quote:

> "Q Now, as a result of those observations and what happened on that particular evening was anything done to the other signs leading up to the turn on the following day?
> "A Yes, there was.
>
> "Q All right, now, were those signs changed or were they not?
> "MR. SAYRE: Your Honor, we would object again for the same reasons.
> "THE COURT: That objection will be sustained."

As an offer of proof out of the hearing of the jury the witness testified that two of the signs were changed

after the collision. One of them, the "Prepare to Stop" sign was changed to Scotchlight. Counsel then elicited further testimony to the effect that some yellow crosspatching marks were added after the collision. Plaintiff made no objection. Again upon redirect examination the following transpired concerning the "One Way—Do Not Enter" sign:

"Q I see. Now the sign was actually moved from this point here to the other side of the highway wasn't it, Mr. Macomber?

"A Right afterwards, yes sir. When those light posts were installed that sign was moved over.

"Q As a matter of fact the entire intersection was rearranged and changed there, wasn't it?

"A Not any more than the light post right around those yellow marks—

"Q Well, weren't there a system of lights put in there?

"A Oh, yes."

After the testimony was in counsel for plaintiff objected to "any further testimony on what is done afterwards."

Out of the hearing of the jury defendant offered to prove that after the collision an entire automatic light and bell system was installed and that the right hand, or southerly lane of the old road was barricaded. Thereafter the witness Massee was permitted to testify over objection by plaintiff that on the evening after the collision, "the majority of the traffic flowed through the old established highway." Thereafter counsel for defendant asked witness Ely "if there's a spotlight turned on the *present* sign." [Italics ours.] Objection was made and sustained, and a formal offer of proof was made.

Again counsel for defendant presented testimony by defendant Art Palmer that on the evening after

the collision he drove east on the old road without turning into the connecting road. No objection was made.

The testimony and rulings on these issues may be summarized as follows:

As to changes made in the signs after the collision:

1. Evidence was first received showing changes. No objection.
2. Evidence was offered to show changes. Objection was made and sustained.
3. Additional evidence was received showing changes. No objection or motion to strike.
4. Further questions concerning changes. Answer made that there were further changes. No objection.
5. Further questions on same subject to which objection was made and sustained.
6. Further questions and answers showing change with objection made after receipt of the testimony. Objection sustained but no motion for or order to strike.

As to the evidence that traffic followed the old road disregarding the signs after the collision:

1. Evidence that traffic followed old road. No objection.
2. Another question put on the same matter, followed by an objection which was sustained.
3. Question on the same matter, followed by an objection which was overruled.
4. Question on the same matter, followed by an objection which was overruled. Answer given that traffic went through on the old road.

As to the changes in the yellow cross-patching after the collision:

1. Testimony to changes. No objection.
2. Plaintiff inquires on the same subject. Answer—that changes were made.

3. Question on same subject. Answers showing change. No Objection.

■■ In considering the effect of the evidence given, and rulings made, it is worthy of notice that no instruction as to the effect of changes in the signs after the collision was either requested by the plaintiff or given by the court. Whether the defendants were negligent was a question for the jury to determine under the conditions existing when they drove through the old road immediately at the time of the collision. There was substantial evidence as to the nature of the signs, their position and visibility at the time. Changes thereafter were not relevant to the case presented to the jury. This was apparently the view of the trial court. We see no distinction between the case of changed highway signs and the case of changed cross-patching marks on the highway. As to the latter, all the evidence went in without objection. In view of the fact that positive and substantial evidence concerning the changes made after the collision went in before any objection was made and even after objection had been made, more evidence to the same effect was received, followed only by a belated objection with no motion to strike, and in view of the further fact that no request for pertinent instructions on the issue was ever made, we think that the first assignment of error does not warrant reversal of the case. Counsel for defendants was, we think, unduly persistent in pursuing the matter after the first ruling, but under the circumstances, we find no prejudicial error. The failure of the plaintiff to make timely objections or to secure from the court an assurance that it would consider that a general objection had been made to all future evidence on the same issue, without a repetition of the objection, leaves plaintiff in no position to claim reversible error.

■ No motion for mistrial on account of misconduct of counsel was made. The principles set forth in the following cases are equally applicable here: *Madden v. Condon National Bank,* 76 Or 363, 149 P 80; *Shaw v. Pacific Supply Cooperative et al.,* 166 Or 508, 113 P2d 627; *Parmentier v. Ransom,* 179 Or 17, 169 P2d 883; *Pond v. Jantzen Knitting Mills,* 183 Or 255, 190 P2d 141; *Mason v. Allen,* 183 Or 638, 195 P2d 717. In matters of this kind the trial court can and should exert reasonable control over the time and manner in which offers of evidence are made, to the end that once a definite ruling has been deliberately made, all further efforts to get the same objectionable matter before the jury, whether by questions, answers, or offers of proof shall be so made as not to influence the jury. In holding that in this case there was no reversible error asserted in plaintiff's first assignment, we do not intend to express any disagreement with the opinions of this court in *Guedon v. Rooney,* 160 Or 621, 644, 87 P2d 209, and *Howland v. Fenner Mfg. Co.,* 104 Or 373, 206 P 730, 207 P 1096.

■ Our ruling on the second assignment must be similar to that on the first. If the defendant violated the law which requires that drivers of motor vehicles should act in obedience to traffic signs, the fact that others thereafter also violate it would be immaterial, and evidence to that effect inadmissible. If customary violation of traffic regulations is inadmissible (*Frame v. Arrow Towing Service,* 155 Or 523, 64 P2d 1312) then, a fortiorari, evidence of violation not even supported by custom would also be inadmissible. See also *Myrtle Point Trans. Co. v. Port of Coquille River,* 86 Or 311, 168 P 625; *Fromme v. Lang & Co.,* 131 Or 501, 281 P 120. If defendant did not violate the traffic laws as applied to the facts, then also evidence that others did not violate them would be equally inadmissible.

■ Defendant relies upon *Hall v. Brown,* 102 Or 389, 202 P 719; *Ragan v. MacGill,* 134 Or 408, 292 P 1094; *Barnes v. Davidson,* 190 Or 508, 266 P2d 289; *Adkins v. Barrett et al.,* 196 Or 597, 250 P2d 387; *Robertson v. Coca Cola Bottling Co.,* 195 Or 668, 247 P2d 217. The first two cases cited relate to the admissibility of experiments when made under proper conditions. The other cases cited stand for the proposition that common usage may be relevant in determining whether certain conduct or the use of certain facilities is negligent. None of the cases establish a rule that existence of the conduct of others, subsequent to that of the parties, is relevant, when the question is whether the defendant did acts in violation of express traffic regulations, under circumstances making such violation negligence per se. If, in the case at bar, the defendant had called as witnesses those who drove through on the old road on the night of the collision, and had asked them if they looked for the ''One Way—Do Not Enter'' sign, and having looked, were unable to see it, a different question would be presented. But here the evidence merely showed that they drove through. It was left to speculation whether they looked and did not see or looked and did see but went through anyhow. The element of speculation is greatly increased when it is recalled that the old road was closed to eastbound traffic only a few hours before they drove through, and as a result they may have been following habit without paying proper attention to the existence of the signs. We hold that the evidence of the flow of traffic over the old road after the collision was inadmissible. But here again the evidence first went in without objection. More evidence to the same effect was offered and objection was made and sustained and when a further attempt was made to elicit further testimony the court indicated in the presence of the jury that the

witness might answer, and finally additional evidence was received without objection, to the effect that Art Palmer had driven through without turning into the connecting road.

■ We are confronted with the same problem as in the consideration of the first assignment of error. No instruction was requested or given to clarify the issue. Ordinarily plaintiff cannot speculate on the answer of a witness and then after it has been given and appears to be prejudicial, make a belated objection to later evidence of the same kind and claim reversible error. *Colgan v. Farmers' & Mechanics' Bank,* 59 Or 469, 106 P 1134, 114 P 460, 117 P 807.

The following cases hold that the appellate court will not consider the admissibility of evidence received without objection where there is no motion to strike: *Perry v. Hunt,* 62 Or 256, 125 P 295; *Jones Land & Livestock Co. v. Seawell,* 90 Or 236, 176 P 186; *Hostetler v. Eccles,* 112 Or 572, 230 P 549; *Carstens Packing Co. v. Southern Pacific Co.* 134 Or 53, 292 P 89; *La Grande National Bank v. Crum,* 139 Or 530, 11 P2d 553; *Parmentier v. Ransom,* 179 Or 17, 169 P2d 883.

■ After the witness Potts had testified in detail to the subsequent flow of traffic, we cannot say that the reception of merely cumulative evidence to the same effect over objection would in and of itself warrant reversal.

We now come to the question of contributory negligence. According to the only evidence in the case, the witness Sheckler was driving the west bound car in which the deceased owner of the car was riding. If plaintiff was chargeable with any negligence it could only be on the theory that the negligence, if any, of the driver, must be imputed to him by reason of their relationship or that he was personally guilty of neg-

ligence. We will first consider the law and the facts relative to the personal conduct of the deceased.

▮ The duty of a passenger in an auotmobile is set forth in *Burns v. Coast Auto Lines,* 134 Or 180, 292 P 1038, in which similar facts were presented. An instruction was approved which imposed upon a passenger the duty of a reasonably prudent man under the circumstances, one of the circumstances being that he was a passenger and not the driver. If he had reasonable opportunity to learn of danger and avoid it, it would be his duty to perform such act of remonstrance or control, if any, as a reasonably prudent man would exercise under the circumstances. The rule has been elaborated in later cases. The situation must be distinguished from cases in which a guest passenger is suing his host driver. In the case with which we are concerned the question relates to the duty of a passenger to exercise care for his own safety when the negligence of a third party driver is in issue. In such a situation the rule is laid down in *Whiting v. Andrus,* 173 Or 133, 144 P2d 501:

"* * * As a general rule, however, 'save in exceptional situtions, a guest or passenger in a vehicle is not required to keep a constant lookout or to see to it that he shall be in a condition to do so'. Restatement, Torts, section 495. He need not keep a watch on the road, or do 'back-seat driving'. Lawrence v. Troy, 133 Or. 196, 289 P. 491; Rogers v. Portland Ry., Light & Power Co., 66 Or. 244, 134 P. 9. There being nothing in the circumstances which served to warn her to be on the qui vive, even the fact that she was day-dreaming was not evidence of negligence on her part.

\* \* \* \* \*

"Even if Mrs. Whiting had known of the hazard which was created by the presence of the parked cars upon the highway, the evidence is that the driver of the car was also aware thereof. She was under no duty to inform him of something which

he already knew. *Gilman v. Olson,* 125 Or. 1, 265 P. 439; *McCrate v. Morgan Packing Co.,* (C.C.A. 6) 117 F. (2d) 702. However, until the collision actually took place, she knew nothing of the imminence of the danger. She was not required to look out for possible dangers, and had not undertaken to do so. She had instrusted her safety to the driver of the car, and there is no evidence whatever to indicate that she was negligent in doing so."

And see *Hamilton v. Haworth,* 180 Or 477, 177 P2d 409.

■ There is not a word of evidence concerning the conduct of the deceased at or just before the collision except that he was a passenger. He was killed and Sheckler was knocked unconscious and suffered post-traumatic amnesia. How then was it possible for the defendants who had the burden of proof to show what action, if any, the deceased took or did not take, or what remonstrance, if any, he made at the time. For all we know he may have been nonnegligently "day-dreaming" or sleeping, or he may have seen danger and remonstrated with Sheckler. There was no evidence of any personal negligence on his part and the jury should have been so advised. Notwithstanding this fact, the court gave an instruction, of which we set forth a part:

"* * * However in this connection, before the plaintiff would be entitled to recover, you must consider whether the plaintiff's husband was guilty of any act of contributory negligence charged in defendants' answer, which contributed to his injuries and resulting death. If the husband of the plaintiff was negligent in a manner which contributed to his injuries and resulting death and such negligence as set forth in defendants' answer, that fact, if you find it to be a fact, would preclude the plaintiff from recovering in this case."

Again the court instructed:

"* * * in this connection, the slightest negligence which was a contributing cause of the death

of plaintiff's husband on the part of plaintiff's husband would be sufficient to bar a recovery by plaintiff.''

In a later instruction the court advised the jury:

''* * * Now, in this connection, if you find from a preponderance of the evidence that the vehicle of the plaintiff's husband was not under the control as required by the Oregon Law above set forth then the plaintiff's husband would be guilty of negligence as a matter of law and could not recover in this case.''

To each of these instructions exception was taken on the ground that it submitted the issue of contributory negligence. It will be observed that in the first of the quoted instructions the question was submitted to the jury as to whether the deceased was *guilty of any act* of contributory negligence. It is not to be assumed that the jury would understand the court to be applying the maxim quae facit per alium facit per se, or was in legal effect instructing on imputed negligence. The instructions submitted to the jury the issue of personal negligence on the part of the deceased and by so doing error was committed.

 In conclusion we hold that the Highway Commission had the right to direct traffic as indicated by the signs which were installed, and that, if lawfully placed, violation of directions would be negligence per se. They would not be lawfully placed unless visible, but there was substantial evidence to the effect that they were official signs and were visible. ORS 366.450, 483.128, 366.215, 366.295, 483.028 (2), 483.040, 483.016. *Nadeau v. Perkins,* 135 Me 215, 193 A· 877; and *Jones v. Lahn,* 1 NJ 358, 63 A2d 804, are distinguishable.

Much incompetent evidence was received concerning changed conditions, and events occurring after the collision. The personal negligence of the deceased was improperly submitted to the jury.

■ We deem it unnecessary to consider the extremely close question as to whether there was any substantial evidence that Sheckler was guilty of negligence or whether such negligence, if any, was imputable *as a matter of law* to the deceased. Inspection of the instructions will show that those on contributory negligence were drafted just as they would have been had the deceased been the driver. Assuming that Sheckler was negligent, the jury should have been instructed concerning the rules of law under which his negligence might be attributed to the deceased. No such instructions were given.

In view of these errors and of the further fact that the record was encumbered with incompetent evidence, we are of the opinion that plaintiff did not have a fair trial. The judgment is reversed and the cause is remanded for a new trial.